**(101 South. 383)**

**No. 23886.**

### EXNICIOS v. SUN INS. OFFICE.

(July 8, 1924. Rehearing Denied Sept. 25, 1924.)

*(Syllabus by Editorial Staff.)*

1. **Insurance** ⬤➾665(4)—**Evidence held to establish owner set fire to insured building.**

Evidence *held* to establish that plaintiff, suing on fire insurance policy, himself set fire to dwelling, insured.

2. **Insurance** ⬤➾615—**Request for rescission of policy and tender of unearned premium not conditions precedent to asserting defense of arson by plaintiff.**

Plaintiff, whom evidence established set fire to his dwelling for purpose of collecting insurance on it and furniture, *held* not entitled to recover, though defendant had prayed for no rescission of policy, and had not tendered him unearned portion of premium paid.

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

Action by Samuel Exnicios against the Sun Insurance Office. Judgment for defendant, and plaintiff appeals. Affirmed.

E. M. Stafford and Daniel Wendling, both of New Orleans, for appellant.

Spencer, Gidiere, Phelps & Dunbar, of New Orleans, for appellee.

By the WHOLE COURT.

OVERTON, J. The purpose of this suit is to recover judgment against defendant for the sum of $1,850, for 12 per cent. statutory damages thereon, and for a reasonable attorney's fee, on a fire insurance policy, written by defendant, on furniture belonging to plaintiff. The defense is that plaintiff set fire to the house, which contained the furniture, or else caused the house to be set afire. The facts are as follows:

Plaintiff's wife was the owner of a two-story double house, located at 2009 and 2011 Baronne street, in this city. The dwelling was insured as the property of plaintiff's wife for $6,000. One half of the house, the half bearing the number 2009, was occupied by tenants, and the remaining half, bearing the number 2011, was occupied by plaintiff and his family, consisting of his wife, an unmarried son, his little daughter, a child of about 5 years of age, and temporarily by plaintiff's married son and his wife, who had been guests in the house for some weeks.

In the half of the premises in which plaintiff lived there were four rooms downstairs, and five bedrooms and a bathroom upstairs, with but one stairway leading from the first to the second floor.

Plaintiff and his wife occupied the first or front room upstairs as their bedroom, and we assume that, when their little daughter was at home, which was generally the case, she occupied it also. The second was occupied by the married son and his wife, the third by the unmarried son, and the fourth and fifth were vacant.

The part of the house in which plaintiff and his family lived was furnished throughout. The furniture belonged to plaintiff, and was insured as his by defendant in the sum of $2,350. It is upon this policy that the present suit is brought.

[1] On the morning of March 26, 1917, plaintiff's little daughter was sent to spend the day and night with her married sister, who lived in the upper portion of the city. On the evening of that day, at about 8:30 o'clock, plaintiff, his wife, two sons, and his daughter-in-law attended a card party, at the home of plaintiff's sister-in-law, returning at approximately 12:30 a. m. When they reached home, they noticed no sign indicating that any one had entered the house during their absence. The family testified that they went upstairs, and retired at once for the night. Mrs. Exnicios, the wife of plaintiff, testified that at 3 o'clock she was awakened, and noticed that her room was full of smoke, and that the house was

afire, her husband still being asleep. The alarm of fire was given to the members of the family, and they hastened downstairs, to make their escape, some still in their nightclothes, and the others not much better attired. The members of the family testified that they noticed nothing on the stairway as they descended.

The fire awoke the neighbors, and one of them sent in the alarm to the fire department. In a very few minutes Hose Company No. 5 reached the scene, and very shortly thereafter, or about the same time, other companies arrived. So soon as Hose Company No. 5 arrived at plaintiff's home, the captain of the company and some of his men opened the front door, and started upstairs with a hose. When they reached the turn in the stairway one of them stumbled over a five-gallon demijohn, knocked it over, and it rolled down the steps. When it was knocked over, or in rolling down, it broke, and the odor of turpentine and oil was at once noticeable.

The firemen, in ascending the steps, also observed a quilt and a blanket on fire, hanging over the railing at the top of the stairway. Other evidence in the record shows that the quilt and the blanket had the odor of turpentine on them.

When the fire, which was entirely, or almost entirely, in the first and second bedrooms, and in the attic, was extinguished, the firemen entered the bedrooms. In the first room they found a square hole cut in the floor, containing charred kindling wood. In the third room, back of an armoire, they found a rectangular hole cut in the partition wall. This hole contained kindling wood. Immediately in front of the hole, a large glass bottle was found, two-thirds full of some kind of liquid, with toilet paper running from its mouth into the hole cut in the wall. Scraps of paper were also found piled between the bottle and the wall. The con-

tents of the bottle were analyzed later by a chemist, and were found to consist of alcohol, turpentine, and gasoline. In the fourth room a hole was also found cut in one of the partition walls. This hole contained paper and scraps of pine wood. Several hours after the fire, the attic was visited by the chief deputy fire marshal. In the interim between the fire and the visit of the marshal, the building was in charge of the fire patrol, a member of which had been stationed there. The fire marshal, on his visit to the attic, found the remnants of a large demijohn near its entrance, which had the appearance of having been broken as a result of fire, the record disclosing that it was surrounded by burnt paper and burnt wicker. Another demijohn was found in another part of the attic, with a paper fuse, running from its mouth to the joists in the attic. The remnants of a line or trail of toilet paper were also found, running along the joists to the front of the attic. This line of paper was burned between the joists, though not at all places where it crossed them.

Referring again to the hole that was found in the floor in the first bedroom, the record discloses that an auger was used to make it. This appears from the fact that at both ends of the hole there was evidence of a continuous line of auger holes. The same condition, as we appreciate the evidence, existed in the other rooms in which holes were found in the floors. Pieces of kindling of the same kind of wood as the flooring were found in the holes in the floor, in the back yard near the kitchen door, and in the kitchen behind the stove. An effort was made to determine whether these pieces originally formed part of the flooring where the holes were cut. The effort disclosed that they did, and that those parts of the auger holes, in the fragments of flooring found, fit the parts of the holes in the flooring that remained. A chest of tools was found in an outhouse on the

premises. When the chest was opened, an auger was found at the top. An effort was made on the trial to show that the holes in the floor were cut by members of the fire companies, in fighting the fire, or by the fire patrol. The record shows that it does occur that holes are often cut by the fire patrol in the floors of a building that has been on fire and has been flooded with water, for the purpose of enabling the water to escape, and of thereby preventing the building from sagging. However, the record leaves the impression that it was not found necessary to take such precautions in this case. Moreover, when precautions of that nature are taken, an ax is used to cut the holes, and not an auger, and triangular holes are cut, and not square or rectangular ones.

Besides these observations, the theory that the holes were cut for the purpose of protecting the building from the effects of the water thrown into it does not account for the holes cut in the partition walls, and for the placing of a bottle, containing inflammable liquid, with a fuse running from it, opposite one of the holes; nor for the preparations made by some one, apparently for the purpose of starting a fire in the attic, for these and similar acts, cannot reasonably be charged to the firemen and the fire patrol, nor is it attempted to so charge them. Plaintiff, however, attempts to meet this phase of the case by contending that, if the building was set on fire intentionally, the evidence does not disclose that he set it afire, and that, if it was so set on fire, the incendiary act was not his, but was that of his enemies, and that he himself was without motive to destroy the building and its contents.

In so far as relates to motive, we think that the evidence shows that if plaintiff set the house afire—and the evidence abundantly establishes that some one set it afire—plaintiff did so in the hope of gaining more for himself and his wife by burning the house and its contents than could be obtained by their sale, and that there were grounds for him to so think. In so far as relates to the evidence offered to show that, if the house was set on fire by any one, the act was that of plaintiff's enemies and not of plaintiff, we regard the evidence offered by plaintiff for that purpose as unsatisfactory and as adding nothing to his case.

In our view the house was set on fire by plaintiff. He hoped to gain financially by burning it and its contents. The extensive preparations made to set it afire, and to facilitate the progress of the fire after it started, indicate, we think, that it was set on fire by some one occupying the dwelling rather than by an outsider. The fact that it is not at all likely that an outsider would have cut holes in the floors and awaited the return of the family, before starting the fire, because of the danger that one of these holes might be detected on the return of the family, and the plan thereby foiled, and the further fact that it is still more unlikely that an outsider would attempt to cut holes in the bedrooms, after the family's return, for the purpose of starting, or facilitating the progress of the fire, indicate also, we think, that the house was set afire by some one occupying it rather than by an outsider. We are also of the opinion that, when plaintiff and the members of his family rushed down the stairway to escape from the fire, all at about the same time, the five-gallon demijohn, which the firemen stumbled over in ascending the same steps, at the turn in the stairway, only a few minutes afterwards, was there, yet, according to the evidence given by plaintiff and the members of his family, they neither saw nor stumbled over anything in descending. We think that the denial of the presence of the five-gallon demijohn there militates against plaintiff. It is the denial of a fact of which he must have

had cognizance. The record as a whole satisfies us that plaintiff set the house afire.

[2] Plaintiff, however, contends that he should recover in this case, notwithstanding the conclusion reached by us as to the origin of the fire, for the reason that defendant has not prayed for the rescission of the policy sued upon, and for the further reason that defendant has not tendered him the unearned portion of the premium paid on the policy.

Plaintiff's contention is clearly untenable. In order to defeat the suit on the ground that plaintiff set the house afire for the purpose of recovering the insurance on the furniture therein, defendant was not called upon to pray for the rescission of the policy or to tender the unearned premium.

For the reasons assigned, the judgment appealed from is affirmed, plaintiff to pay the costs of appeal.

Rehearing denied by the WHOLE COURT.