## PARKER et al. v. HARTFORD FIRE INS. CO. OF HARTFORD, CONN.*

No. 16123.

Court of Appeal of Louisiana. Orleans.

Oct. 7, 1935.

· Lemle, Moreno & Lemle, of New Orleans, for appellant.

Philip S. Pugh, Jr., and Harold A. Moise, both of New Orleans, for appellees.

LECHE, Judge.

Plaintiffs filed this suit in the Civil District Court for the parish of Orleans to recover the sum of $1,000, plus interest, penalties, and attorney's fees, under a certain policy of fire insurance in the Louisiana standard form.

The petition alleges that plaintiffs are the holders of policy No. 73,082 issued by defendant company in the principal sum of $1,000 covering household and personal effects, etc., while located and contained in the premises known by the municipal number 2530 Sage street in the city of New Orleans; that on December 21, 1932, at about 12:30 o'clock a. m., and while said policy was in full force and effect, a fire occurred in the described premises, resulting in a loss to petitioners in the full sum of $1,000; that the defendant failed and refused to furnish blank proofs of loss and denied liability. Plaintiffs pray for the full amount of the contract in the sum of $1,000, plus 12 per cent. damages amounting to $120, reasonable attorney's fee in the sum of $150, all amounting to the sum of $1,270, with legal interest from judicial demand and for all costs.

In its answer defendant company admitted the existence of the policy and the occurrence of the fire, but alleged that the fire was preceded by an explosion due to the presence of gasoline on the premises placed or caused to be placed by plaintiffs.

A verdict was returned in favor of plaintiffs in the sum of $1,049, together with interest and costs, and judgment was rendered accordingly. From this judgment, defendant has appealed.

The principles of law applicable to this case are firmly established in the jurisprudence of this state. In the first place, a distinction is made between the character of proof necessary to sustain a criminal charge of arson and that requisite to maintain a defense in a civil suit on a

436

policy of fire insurance. Under the well-recognized rule of criminal law, the crime of arson must be proven beyond a reasonable doubt. If there is a reasonable doubt, there must be an acquittal. In a suit on a policy of fire insurance, the burden of proof rests upon the insurer to establish the facts upon which it has based its defense and seeks a release from its contractual obligation, and, as in all other civil actions, issues of fact are determined by a preponderance of evidence. Thus the rigorous rule of the criminal law, being relaxed in a civil suit, it is conceivable that under the identical set of facts an acquittal might be obtained of the charge of arson in a criminal suit and a good defense maintained in a civil suit on the policy contract. Furthermore, in cases of this character, every kind of evidence, circumstantial or presumptive, which tends to convince the mind may be adduced by either side. The reason for this rule is based upon the fact that the setting or causing to be set of the fire is always attended by the utmost secrecy. There are no eyewitnesses, and the illegal act is seldom exposed to the light of day. On the other hand, not only must the facts from which the inference or presumption of the act is drawn be established by evidence, but the inference or presumption to which these proven facts give rise must be strong and almost inevitable, or, in the language of the Civil Code (Civ. Code, art. 2288), be "weighty, precise and consistent." The mere creation of a suspicion will not suffice to defeat an action under the policy contract, and the facts and circumstances of each particular case must be, in the light of the foregoing rules, addressed to the sound discretion of the court. Wightman v. Western Marine & Fire Ins. Co., 8 Rob. 442; Breard v. Mechanics' & Traders' Ins. Co., 29 La. Ann. 764; Dunn et al. v. Springfield Fire & Marine Ins. Co., 109 La. 520, 33 So. 585; Baker & McDowell Hardware Co. v. Liverpool & London & Globe Ins. Co., 3 Orleans App. 461; Hoffman v. Western Marine & Fire Ins. Co., 1 La. Ann. 216; Adams v. Liverpool & London & Globe Ins. Co., 5 Orleans App. 301; Catalanotto v. Minneapolis Fire &. Marine Ins. Co., 15 La. App. 320, 131 So. 705; Exnicios v. Sun Ins. Office, 156 La. 975, 101 So. 383, 384; Picoraro v. Insurance Co. of State of Pennsylvania, 175 La. 416, 143 So. 360, 361; Giglione v. Norwich Union Fire Ins. Soc., 173 La. 801, 138 So. 843; St. Philip v. Lumbermen's Ins. Co. of Philadelphia, 18 La. App. 331, 137 So. 359, 360.

In the light of the foregoing jurisprudence and the rules of law applicable to this case, we proceed to an examination of the facts and circumstances as disclosed by the record.

On the evening of the fire, or, more properly, on the evening preceding the fire —for it appears that the fire occurred shortly after midnight—plaintiffs left the premises in their automobile between 7 and 7:30 o'clock p. m., and proceeded to the home of a sister-in-law, where they remained until sometime between 9 and 9:30 o'clock p. m., at which time they left and proceeded to the home of Mr. Frank Hurstell, a brother-in-law, who occupied the premises 5102 St. Claude avenue, some distance from plaintiffs' home. Mr. Hurstell and Mr. Schneider, one of the plaintiffs, began at once to repair the electrical system on Schneider's automobile and were so engaged until about 12:45 a. m., at which time, though the repairs had been completed, they were unable to start the car in the customary manner. The two men pushed the automobile out of Hurstell's yard and it came to rest upon a street car track, impeding a street car on its way to the barn. Immediately thereafter Hurstell backed out his own machine and the Schneider car was started by being pushed some distance by Hurstell. The Schneiders, husband and wife, then proceeded to their own home on Sage street, where they learned of the fire which, by that time, was well under control, if not extinguished. Thereupon Mrs. Schneider, according to her testimony, fainted as a result of the shock at seeing her home destroyed.

The fire, which had been first noticed at about midnight, was unquestionably preceded by an explosion. This fact is uncontradicted and clearly brought out by the testimony of neighbors who heard the explosion, and by the condition of the premises after the fire. One of the side walls of the house on the same side as the living room, dining room, and kitchen, was blown out from the top so that it leaned upon the fence separating the premises from the house next door, a space or opening several feet in width being apparent between the upper side of this wall and the roof or upper portion of the premises.

The house in question was constructed of wood, consisting of what is commonly

known as frame or mill construction. It was of the cottage type. On one side from front to back there were a living room, a dining room and a kitchen, and on the other side from front to back were a bedroom, a bathroom and a rear bedroom and also a small screened porch. There was a concrete porch in the front of the house. After the fire there were found in the premises by members of the police department, of the fire department, and of the fire insurance patrol, several large cardboard or fiber containers, cylindrical in shape, and of the kind in which ice cream is usually packed, and each capable of holding several gallons of liquid. Four of these containers were pratically intact and the charred remains of a fifth was found in the kitchen, where the fire raged most fiercely. . The containers were distributed throughout the rooms of the house and three of them were damp and had the odor of gasoline about them, while in the other one there still remained a certain quantity of gasoline. The captain of one of the fire companies found the burners on the gas stove in the kitchen with the jets open and turned them off himself. It was further established that there was a hot-water heater in the kitchen with a pilot light burning, and the record clearly discloses that the combustible gas caused by the evaporation of the gasoline, which was in the containers, combined with the escaping gas from the jets of the gas stove, gradually drifted upwards, forming an explosive substance which eventually came into contact with the pilot light of the hot water heater, thereby causing the explosion, which blew out the side of the house nearest the kitchen. The kitchen, wherein the combustible gas was ignited by the pilot light, was the most badly damaged portion of the house, and next to that was the dining room. The living room and the bedrooms were scorched and the window draperies and bed clothes burned as though a sheet of flame had swept through them, which are results which would follow such conditions.

A close study of the record and of the evidence adduced by both sides convinces us that the fire was unquestionably of an incendiary origin. We attach no weight whatsoever to the attempt made by plaintiffs to show that their neighbors set fire to the house. The aged couple with whom plaintiffs had had some slight disagreement, in so far as this record shows, have not the slightest suspicion cast upon them. As was

said in Exnicios v. Sun Ins. Office, supra: "In so far as relates to the evidence offered to show that, if the house was set on fire by any one, the act was that of plaintiff's enemies and not of plaintiff, we regard the evidence offered by plaintiff for that purpose as unsatisfactory and as adding nothing to his case."

Plaintiffs' counsel ably and strenuously attempt to show lack of motive in their client for destroying or attempting to destroy their home. Plaintiffs, husband and wife, had been married some sixteen or eighteen years and, in so far as the record in this case is concerned, bore a good reputation. Mr. Schneider was employed as a crane operator at the cotton warehouse owned and operated by the Board of Commissioners of the Port of New Orleans and worked there on and off for some eighteen years. As was the case with most wage earners, during the depression his rate of pay was somewhat reduced prior to the occurrence of the fire. He had a small income from raising and conditioning game chickens and from odd jobs as an automobile mechanic. In addition to this, Mrs. Schneider worked at odd times as a cashier in a restaurant, receiving $6 or $7 per week while thus engaged. In July, 1930, plaintiffs purchased for $1,025 the lot of ground upon which the house was afterwards constructed. On July 9, 1930, a loan was negotiated through the American Homestead Association in the sum of $3,300, and a contract was let for the construction of the house. The homestead valued the entire property at $4,850, the value of the house being fixed in the building contract at $3,300, leaving the value of the lot at approximately $1,550. This appraisement and valuation was at the time of the loan, July, 1930. Plaintiffs' monthly payment to the homestead amounted to $33, and, on December 21, 1932, the date of the fire, plaintiffs had paid their interest installment up to November 30 and the installment on the principal to October 31, 1932, so that the loan was one month in arrears in interest and two months in arrears in principal, the next payment not being due until December 31, or some few days subsequent to the fire. At the time of the fire plaintiffs had paid a total of $362.42 in principal to the homestead and over $500 in interest, making a total of over $862.42 actually paid in cash by them. Now this amount, added to the price paid for the lot, $1,025, makes a total cash outlay on the part of plaintiffs of $1,887.42,

438

this amount commonly being called their equity in the property. There was a policy of insurance covering the house in the sum of $4,500 with a standard mortgage or loss payable clause in favor of the American Homestead Association. In addition to this there was the $1,000 policy herein sued on, covering the furniture. Assuming that the premises would have been considered as totally destroyed, and that the insurance company could be persuaded to pay the loss in cash rather than to exercise its option to rebuild, out of the $4,500, of insurance, $2,935 would have been paid to the homestead under its loss payable clause and the balance of $1,565 would have been paid plaintiffs. They would also have received $1,000 under the policy herein sued on, making a total cash payment to them of $2,565, and they would still have owned the lot of ground upon which the house was erected.

It is true that there is some evidence in the record that an offer to dispose of the house was made plaintiffs in exchange for a double cottage and $1,500 in cash, but this was a year or more before the fire at a time when plaintiffs were, perhaps, in a better financial condition and when their house was practically new. At the time of the fire, however, plaintiffs' earnings were less than $100 per month and besides the $33 monthly payment to the homestead they were obligated to carry insurance on the house and to pay taxes in addition to feeding and clothing themselves and supporting their automobile.

After the fire plaintiffs turned their home back to the homestead and lost everything. They assigned as the reason for this that in order to restore their property the homestead insisted that they borrow $800 more and in their then financial state they did not feel that they were in a position to assume this additional obligation. But, under the terms of the policy contract, the insurance company was obligated to pay the full amount of the loss or to restore the property to its condition previously to the fire. It would seem that if plaintiffs really had an interest in preserving their home that they would have brought a suit under the other policy to compel the insurance company to restore the property or pay the full amount necessary to restore it without any loss to themselves. Under these circumstances, the complete abandonment of the property does not create, in our opinion, an impression of good faith.

In the case of Exnicios v. Sun Ins. Office, supra, the court said: "In so far as relates to motive, we think that the evidence shows that if plaintiff set the house afire—and the evidence abundantly establishes that some one set it afire—plaintiff did so in the hope of gaining more for himself and his wife by burning the house and its contents than could be obtained by their sale, and that there were grounds for him to so think."

It is most difficult—in fact, usually impossible—in cases of this kind, to obtain positive evidence of incendiarism. As stated above, we must rely largely on circumstantial evidence, but that evidence must do more than create a mere suspicion.

In the case of Picoraro v. Insurance Co. of State of Pennsylvania, supra, in sustaining the defense that plaintiff set fire to his premises, the court said: "It is true that the motive was not great, because the value of the building and its contents—together with the value of a small building beside it which also belonged to Picoraro and was uninsured—was almost as much as the amount of insurance on the building and furniture. But the evidence convinces us that the insurance money was more desirable than the vacant building was to Picoraro."

The record in that case showed that Picoraro owned several other houses and lots, had $1,000 in the bank and had $13,000 in two homestead associations which he could have drawn out at any time, yet the court found a sufficient motive to sustain the defense that Picoraro had set fire to his premises.

It is not necessary for us to determine, and we do not undertake to do so, whether or not plaintiffs set or caused to be set the fire which destroyed their home. This is a civil action and to it a special defense was made. The jurisprudence herein cited clearly shows that, to maintain that defense, as in all other civil actions, a preponderance of evidence is necessary. Beyond any question of a doubt, the fire was preceded by an explosion, and it is likewise certain that such a set-up was found on the premises as to convince any fair mind that the explosion and fire were of an incendiary origin. There is a total absence of evidence even tending to show a motive or incentive in any third person or persons. Under these circumstances, the inference or presumption necessary to maintain the defense is, we believe, sufficiently estab-

lished, and the following language of this court in St. Philip v. Lumbermen's Ins. Co. of Philadelphia, supra, we believe to be particularly applicable: "Of course, it is possible that he was the victim of circumstances, and, however unlikely it may seem, some one unknown to him, acting independently and for some purpose of his own, may have started the fire. If such be the case, a grave injustice will have been done plaintiff, in his personal and property rights, and his good name will have been tarnished by the stigma of undeserved pollution. We have no doubt that instances have occurred in the past and will recur in the future, wherein the reliance upon circumstantial evidence has resulted in even greater and more grievous error. All judicial systems, being human, are imperfect, and their operation must inevitably result in certain vicarious sacrifices. All a court of justice can do is to hew to the line of correct judicial procedure and let the chips fall where they may."

For the reasons assigned, the judgment appealed from is annulled, avoided, and reversed, and it is now ordered that there be judgment herein in favor of defendant, dismissing plaintiffs' suit at their cost.

Reversed.