476 So.2d 403 (1985)
Huey P. CHILDS, Huey Childs Builder, Inc., Appellant,
v.
ZURICH AMERICAN INSURANCE COMPANY, et al., Appellee.
Nos. 17131-CA, 17132-CA.
Court of Appeal of Louisiana, Second Circuit.
September 25, 1985.
Writ Denied December 20, 1985.
*404 Campbell, Campbell & Johnson by James M. Johnson, Minden, for Huey P. Childs.
Bienvenu, Foster, Ryan & O'Bannon, by David E. Walle, New Orleans, for Zurich.
Kennedy, Goodman & Donovan, by John M. Frazier, Shreveport, for Alexander & Alexander, Inc.
Before HALL, SEXTON and NORRIS, JJ.
NORRIS, Judge.
Plaintiffs Huey P. Childs and Huey Childs Builder Inc. (the "corporation") appeal from a judgment in favor of defendant, American Guaranty Ins. Co., rejecting demands for fire insurance proceeds based on the defense of arson. The trial court, in an excellent and well considered written opinion, concluded the evidence preponderated to show the fire was of incendiary origin, that plaintiff had motive to burn his residence or have it burned, and that there was no other reasonable hypothesis but that plaintiff was responsible for the fire. Plaintiffs contend on appeal the trial court was clearly wrong in holding that the insurer had satisfied its burden of proof. Finding no manifest error in the trial court's factual conclusions, we affirm for the reasons set forth by the trial court, which we adopt in full but restate for the purpose of brevity.

FACTS
On the morning of September 12, 1980, the new home of housebuilder Huey P. Childs was destroyed by fire. Located on a rural lot on scenic Black Bayou in eastern Bossier Parish, the house was Mr. and Mrs. Childs' "dream home," large, comfortable and well appointed. The actual owner of the house was the corporation, which was closely held and wholly owned by Mr. and Mrs. Childs. Mr. Childs had actively directed and participated in the building effort, providing his services without charge to the corporation; since he and his wife had completed the home and moved in late in 1979, he was planning to transfer the title to himself very soon, when interest rates were more favorable. In an issue that is not before us on appeal, the trial court found that Mr. Childs had an insurable interest in the house. See LSA-R.S. 22:614 B.
Mr. Childs minutely reconstructed the activities of everyone in his family on the day of the fire. The night before, he and Mrs. Childs had stayed in the house along with their daughter Becky and their grandson, Todd. Early on the morning of the fire, Becky's husband, David Emerson, came by the Childs' home for coffee. David Emerson left first, heading for his job in Shreveport. Mr. Childs left briefly to drive an employee to a construction site; he returned quickly. Becky then left with Todd; she first dropped off Todd at school and then proceeded to her job in Bossier City. At 7:45, Mr. and Mrs. Childs left in their separate cars. Before leaving, Mrs. Childs testified she made sure all the appliances were turned off, the house was securely locked, and then activated the alarm system.
The burglar alarm system merits attention. It consisted of two separate units. First was the perimeter unit that connected all the windows and doors in the residence; if any of them was opened, an alarm would sound not only at the house but also at the office of the system's installer, Skyco. Skyco received no alarm that morning. Next was the backup unit. It consisted of an activator alarm under the carpet in the hall. The backup had separate controls from the perimeter unit and Mrs. Childs recalls not activating the backup that *405 morning. Her testimony at trial was the first time she mentioned not activating the carpet alarm system. The perimeter unit, however, was activated, and was apparently in working order. The perimeter unit could be deactivated by a combination that was known only to Mr. and Mrs. Childs. Likewise, only they had keys to the house.
When he left the house, Mr. Childs proceeded to the construction site where he was building a new home for his daughter and son-in-law, the Emersons. Mrs. Childs ran some errands and then went to the Emerson job site. Mrs. Childs and one of Mr. Childs' employees then proceeded in their separate vehicles back to the Childs' home to get some additional supplies. This was when she discovered the fire. She summoned the firemen, who were unable to contain the blaze; the firemen testified that the fire burnt remarkably fast for a new house. It was a total loss.
In addition to the testimony of Mr. and Mrs. Childs, their family members and the construction workers, there was the testimony of two high school students who were waiting for a bus at a nearby bus stop. At about 8:05 a.m., they saw a man running through the woods, away from the Childs residence. He jumped into a maroon pickup truck with a side stripe and shielded his face as he drove off. Mr. Childs' son-in-law, David Emerson, owned a pickup truck very similar to the one described; however, one of the boys said he knew Emerson and recognized that neither the fugitive nor the truck was Emerson or Emerson's. The other boy testified the truck was indeed similar in appearance to Emerson's truck.
After the area cooled, Mr. and Mrs. Childs began sifting through the rubble. They found a decorative table safe which they testified had contained jewelry and money. The Childs further testified the safe was open and some of the contents were found scattered and charred, but much was never recovered. Other evidence, however, indicated the safe had not in fact been forcibly opened. Other valuables, such as guns and silverware, located in other parts of the house, were not touched.
The day after the fire, the insurer, American Guaranty and Liability Ins. Co.,[1] began a thorough examination. A chemical analysis of the debris showed that accelerants had been planted in several locations in the house. A forensics expert said the ashes contained traces of volatile hydrocarbons such as kerosene. He also observed irregular burn patterns and "spalling" of the concrete slabs, all indicative of an incendiary fire. An arson investigator found melted copper tubing; this, he said, was unlikely in a natural fire, which seldom attains temperatures of over 1300°; with accelerants, however, a fire can easily reach the requisite 2000°" needed to melt copper. He also noted the rapidity with which the house burned according to Mrs. Childs' testimony as further indication of the use of accelerants. There was no evidence that the fire was due to faulty wiring. All these findings led the insurer to conclude that the fire was incendiary. Thus the insurer refused to pay the proceeds, asserting the defense of arson. After trial, the trial court had no difficulty confirming this conclusion which, from our review of the evidence, is not clearly wrong. In fact, appellants virtually concede the incendiary origin of the fire and make no issue of this factual conclusion on appeal.
The insurer next asserted that Mr. Childs had a motive to destroy his home. The evidence on this point is so voluminous that it almost defies brief summary. Mr. Childs' financial position was very unenviable at best. Like all homebuilders at the time, he had suffered business reverses. The corporation's gross receipts had declined from over $800,000 in 1978 to $184,132 in 1980. The corporation's 1981 figure, reckoned on a fiscal year, was zero. Mr. Childs' personal income had also plummeted. In 1978, he earned over $50,000 from his business; in 1980, it was not quite *406 $18,000. The 1981 income is listed at $9,186. This decline must have been devastating to Mr. and Mrs. Childs, who were accustomed to spending $36,000 a year on household expenses, exclusive of mortgage payments. Mr. Childs nevertheless owned a number of assets. The corporation owned eight rent houses which generated rent of $11,000 in 1979 and $27,000 in 1980. This money was used by the Childs, individually, to pay the family's personal living expenses. Mr. Childs also owned a tract of land in Webster Parish, plus an interest in the corporation's houses that were under construction. The rent houses and the undeveloped land, however, were dead assets for the same reasons why new Huey Childs homes were hard to unload: interest rates, topping twenty percent, were so high that buyers could not be found for them at any acceptable price. Mr. Childs also owned some stock in a company called Lo-Bar, but he sold the stock in December, 1980, and applied part of the proceeds to pay the fire insurance premiums for the policy on which this suit is based.
Against this pattern of declining income and unsellable assets, the insurer showed that Childs was saddled with very substantial debts at the time of the fire. The Black Bayou house and lot was burdened with a collateral mortgage of $150,000; even though he claimed that the balance stood only at $70,000 on the day of the fire, his bookkeeper thought the debt was around $200,000. Regardless, Mr. Childs admitted that once the house went into his name and he secured permanent financing, he would be owing $2,000 each month on the mortgage. Universal Air Conditioning had already filed a lien against the house for $11,361. Barnett Distributors had obtained a judgment against Childs for $3,225. The corporation was indebted to Louisiana Bank & Trust in excess of $400,000, for which debt the Childs were personally liable. The corporation's net worth had dropped to $4,700. On top of all this, Mr. and Mrs. Childs were incurring monthly household expenses of between $2,500 and $3,000 and facing the immediate prospect of an additional $2,000 house note.
In sum, the evidence shows Mr. Childs as a man in serious financial distress due to his lack of available cash for day to day and business expenses. Although he owned considerable assets that he valued at $1,300,000, a value the trial court found somewhat "questionable," he was unable to find a market for them. Childs contends the rent houses were readily sellable items. However, his effort to sell four of them in the spring of 1980 proved fruitless because of the depressed real estate market. Additionally, the rent houses figured prominently in his retirement plans and had become his chief source of income, so it would have been imprudent to lose them. In late 1980, Mr. Childs derived additional cash from the sale of the Lo-Bar stock. But even with the rental income, the one-time sale of stock and the paltry proceeds of the corporation, the Childs' monthly expenses far exceeded available cash, and this deficit had run unchecked for over a year. The building slump was unprecedented and there was no end in sight. The new house, though obviously special to Mr. Childs, was going to become a special drain on the budget, with no income potential. It was conveniently insured for $360,000, covering the house, the furniture, and the accessories. Mrs. Childs had transferred the insurance from their prior residence to the new home only shortly before the fire; the premium was not paid until three months after the fire, when Mr. Childs sold the Lo-Bar stock.
Based on this evidence, which we admittedly have summarized for brevity, the trial court concluded that Huey Childs was in a serious financial condition due to lack of available cash, that his business outlook was bleak, and that he had no immediately forseeable ability to pay his living expenses and business debts. The trial court found that this bleak financial condition gave plaintiff a strong motive to burn his residence for the insurance proceeds.

DISCUSSION
The classic statement of the law of arson is contained in the case of Sumrall v. *407 Providence Washington Ins. Co., 221 La. 633, 60 So.2d 68 (1952). In Sumrall, the plaintiff was a building contractor who, along with his father, was developing a new subdivision. They had built five houses, of which they apparently had sold two. They were in dire financial circumstances; the house which the plaintiff had built for himself was burdened with numerous liens that had been reduced to judgments. Suddenly, within a span of five days, fires occurred in three of the new houses, destroying two of them. The plaintiff sued for insurance proceeds on one and was met by the defense of arson. In denying recovery, the supreme court reasoned:
Inasmuch as the defense is arson, the burden rested upon the insurer to establish, by convincing proof, that the fire was of incendiary origin and that plaintiff was responsible for it. It is well settled that the insurer need not prove its case against a plaintiff beyond a reasonable doubt; it suffices that the evidence preponderates in favor of the defense. Proof, of course, may be and invariably is entirely circumstantial. And, in these instances, a finding for defendant is warranted where the evidence is of such import that it will sustain no other reasonable hypothesis but that the claimant is responsible for the fire.
* * * * * *
Considering that plaintiff was in dire financial circumstances and that he alone, according to the evidence, would benefit by the fire, there can be no doubt that defendant has established he had a motive for destroying the property. And motive, plus the incendiary nature of the fire, would, in the absence of believable rebuttable evidence, be sufficient to sustain the affirmative defense pleaded by the insurer.
60 So.2d at 69, 70.
See also, Russell v. Niagara Fire Ins. Co., 129 So.2d 545 (La.App.2d Cir.1961), writ denied (unreported); Swindle v. Maryland Casualty Co., 251 So.2d 787 (La.App. 1st Cir.1971), writ denied 259 La. 885, 253 So.2d 217 (1971). The motive in this type of cases is almost invariably the plaintiff's financial straits or dire circumstances.
In the more recent case of Rist v. Commercial Union Ins. Co., 376 So.2d 113 (La.1979), the supreme court restated the burden of proof in arson cases as follows:
By raising the affirmative defense of arson, the insurer has the burden of establishing, by convincing proof, that the fire was of incendiary origin and that plaintiff was responsible for it. An insurer need not prove its case beyond a reasonable doubt; it suffices that the evidence preponderates in favor of the defense ...
The court also quoted the Sumrall formulation regarding circumstantial evidence and noted that questions presented in matters of this sort are "answerable by the particular facts of the controversy."
The plain impact of this statement is to reaffirm the traditional preponderance standard for proving the defense of arson even where the proof is strictly circumstantial. In such a case, in order for the proof to preponderate, it must be such that it will sustain no other reasonable hypothesis but that the insured was responsible for the fire.
On appeal, Childs urges that the circumstantial evidence adduced is insufficient to prove he had a motive to burn his residence. We disagree and conclude that the lower court was not clearly wrong in so concluding. In the first place, the evidence of Childs' financial distress is completely, voluminously documented. This evidence is not in and of itself circumstantial. Although motive can rarely be proved by direct evidence, it is still governed by the preponderance of evidence standard. Russell v. Niagara Ins. Co., supra. Finally, the trial court found the evidence sufficient to prove motive under the facts and circumstances peculiar to this particular case; this finding is entitled to great weight and our review of this record convinces us it is not clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Bridges v. Reliance Ins. Co., 410 So.2d 1243 (La. *408 App.3d Cir.1982); Theriot v. Lanier, 425 So.2d 351 (La.App. 3d Cir.1983), writ denied 430 So.2d 82 (La.1983).
In brief, appellants rely heavily on this court's recent decision in McClain v. Gen'l Agents Ins. Co. of Amer., 438 So.2d 599 (La.App. 2d Cir.1983), writ denied 442 So.2d 458 (La.1983). In McClain, we affirmed the lower court's ruling rejecting the arson defense but amended the judgment by deleting the award for penalties and attorney's fees. However, the main issue in that case, and the one to which the circumstantial evidence test was applied, concerned whether the fire was incendiary in origin. We noted that the insurer's chief evidence was a forensics report based on an investigation of the burnt premises conducted two years after the fire occurred. Eyewitness accounts completely contradicted the expert's reconstruction of the area where the fire started. Thus, even though there was evidence of arson (motive and opportunity to set the fire), the insurer failed to prove by a preponderance of evidence the incendiary origin of the fire. The instant case is not uncertain on this issue in the least. Childs even admits the fire's incendiary origin in brief. Since the particular issue is different here, we distinguish this case from McClain.
Accordingly, we turn to the other issue, whether the insurer proved motive by a preponderance of the evidence, i.e., that Childs was in dire financial straits. On appeal, Childs contends that various pieces of evidence undermine the trial court's finding. First, he offers a large quantity of after-the-fact evidence. He shows that he found his way out of his financial dilemma without the insurance proceeds and without ever declaring bankruptcy. At the time of trial, he had reduced his indebtedness to Louisiana Bank and Trust to a mere $15,000 and had accumulated fairly substantial cash holdings. The trial court acknowledged Childs's "remarkable financial recovery"[2] but apparently thought that his motives could be estimated only on the basis of his knowledge and fears at the time. In September 1980, Huey Childs did not have the benefit of hindsight. The best evidence of his financial outlook was the severely depressed real estate market, his reciprocal, devastating drop in income, his need to finance the house in his own name, his already fixed monthly expenses of $2,500-$3,000, his indebtedness to the bank for $400,000, and need to sell his stock in Lo-Bar, a one-time remedy that would not begin to cover his debt on the house. None of his other assets could be sold. All this evidence preponderates in favor of finding a motive.
Next, Childs insists that the circumstances of the fire negate any involvement on his part. He points to the testimony of the two highschool boys and weaves from it a "sophisticated burglar" theory. The trial court dismissed this as "highly improbable," reasoning that even the most sophisticated burglar would have been unable to enter the house, plant the accellerants, open the safe, light the fire and steal away, within the span of fifteen minutes between the Childs' departure and the spotting of the alleged burglar. It is equally unreasonable to conclude that a "sophisticated burglar" would be more interested in simply burning down the house than in making off with the loot. Even if the boys' testimony is accepted, it only equivocally absolves Mr. Childs's son-in-law from having a hand in the matter. We think the trial court was correct to discount the testimony and to reject this hypothesis as unreasonable. Childs also suggests that we indulge in the presumption that everyone has enemies who would like to burn him out. See Rudison v. Michigan Millers Mut. Ins. Co., 152 So.2d 407 (La.App. 1st Cir.1963), writ denied 244 La. 669, 153 So.2d 883 (1963). But there is no evidence to substantiate this. Moreover, the peaceful, *409 rural locale militates against a presumption of random crime. Cf. Wallace v. State Farm Fire & Cas., 345 So.2d 1004 (La.App. 2d Cir.1977), writ denied 349 So.2d 334 (La.1977).
A close examination of the evidence preponderates to put Mr. Childs, or someone acting for him, at the scene of the fire. The burglar alarm system, though set, was never tripped; no one except Mr. and Mrs. Childs knew how to deactivate it. Moreover, the house was alleged to be securely locked, with only Mr. and Mrs. Childs having keys, and yet it was obviously entered. These circumstances are very convincing.
As we observed in Russell v. Niagara Fire Ins. Co., supra:
It is common knowledge that there are many ways to set a fire, directly or through others, even though the owner of the property is not present. As the court observed in Parker v. Hartford Fire Ins. Co. of Hartford, Conn., La. App. Orleans 1935, 163 So. 435; Catalanotto v. Minneapolis Fire and Marine Ins. Co., 15 La.App. 320, 131 So. 705; the setting, or causing to be set, of an incendiary fire is always attended by the utmost secrecy. There are usually no witnesses and the illegal act is seldom exposed to the light of day.
129 So.2d at 548.
Finally, Childs stands on his resolute denials of any involvement in the fire. Every member of his family joined him in this assertion. The trial court did not specifically state in its opinion that it simply disbelieved their testimony, but this conclusion is inescapable. The question is credibility and the trial court's vantage point in assessing the witnesses is superior to our own. We do not observe the demeanor and tone of the witnesses. We can note, however, that on the transcript pages, Mr. Childs was very evasive and frequently claimed ignorance of facts that he should have known intimately. For example, he did not know how much he owed Louisiana Bank and Trust, or how much his mortgage payments would be, or how much he was drawing from his savings to live on, or how much the house was insured for. He could not explain his 1980 income tax return. He appears not to have communicated all his problems to his accountant, Mr. Guillotte. These are all unusual circumstances for a successful contractor.
Our answer to all of appellants' arguments is essentially that the trial judge saw and heard the witnesses and weighed their credibility and found as a fact that plaintiff committed arson. From our careful review of this record, we do not find the trial judge was clearly wrong.
In sum, we find that there was sufficient evidence to support the trial court's ruling that the insurer proved Childs' motive by a preponderance of the evidence. We are cognizant of the persistency of Childs' denials of wrongdoing, as was the trial judge, but we defer to the trial judge's superior position to judge credibility. The other evidence is so strong that we cannot say the trial court erred in finding that the burden of proof was satisfied. There is not manifest error. Accordingly, the judgment appealed from is affirmed.
AFFIRMED.
NOTES
[1] The named insurer, Zurich American, is a member of the American Guaranty group.
[2] Plaintiff recovered because he switched from new construction to remodeling and because he eventually sold the rent houses in 1982 and 1983, after the housing market had upturned. In addition, Mrs. Childs went to work in August 1981 and thereby brought home income for two and a half years.