659 So.2d 792 (1995)
Lanny and Faye MILEY
v.
UNITED STATES FIDELITY AND GUARANTY COMPANY.
No. CA 94 1204.
Court of Appeal of Louisiana, First Circuit.
April 7, 1995.
Writ Denied June 16, 1995.
*793 Wilson C. Krebs, Covington, for plaintiffs-appellants, Lanny and Faye Miley.
James F. Ryan, Metairie, for defendant-appellee, U.S. Fidelity and Guar. Co.
Before GONZALES and PARRO, JJ., and REDMANN,[1] J. Pro. Tem.
WILLIAM V. REDMANN, Judge Pro Tem.
Plaintiffs sue their fire insurer for the value of their residence and contents destroyed by fire. The insurer contended and the jury found that plaintiffs or someone acting for them set the fire. We affirm the judgment on that jury verdict.
The facts from which this case arose are as follows. Lanny and Jimmy Faye Burch Miley owned a home in Pine,[2] Louisiana, which they constructed in 1971. The home was built on a lot located adjacent to the home of Mrs. Miley's parents. The Mileys' home was insured by a policy written by United States Fidelity and Guaranty Company (USF & G).
Mr. Miley was employed as a carpenter and later operated his own business as a building contractor in the Pine area. Mrs. Miley was self-employed as a beautician and owned and operated several flower and gift shops in the area. In 1991, the Mileys experienced financial difficulties. In August, 1991, they filed a voluntary petition for bankruptcy in the United States Bankruptcy Court in the Eastern District of Louisiana.
Mr. Miley subsequently found employment in Mississippi, then later in Alabama. While Mr. Miley was employed out of state, the Mileys' married daughter, Lanea Miley Stafford, her husband Larry Stafford and the Staffords' infant child resided in the Miley residence while the Staffords' home was being renovated. They had purchased the former home of Mrs. Miley's parents. Whether the Mileys had changed their residence to Alabama at the time of the fire was contested at trial. The Mileys alleged that their nineteen-year-old daughter, Joelyon, had rented an apartment in Alabama; Mr. Miley stayed with Joelyon during the week; Mrs. Miley remained at the Pine residence on weekends; and she commuted to daughter Joelyon's apartment in Alabama several days a week.
On the morning of October 12, 1992, the Miley home was destroyed by fire. At the time of the blaze Mr. Stafford was allegedly hunting in Colorado; Mr. and Mrs. Miley *794 and Joelyon were staying at Joelyon's apartment in Alabama, and Lanea Stafford and her infant child were spending the weekend with the Mileys in Alabama.
A sworn statement of proof of loss totalling $183,600 was submitted by the Mileys to USF & G. USF & G refused payment alleging the fire was set by either the Mileys or someone acting on their behalf. Mr. and Mrs. Miley instituted this action under the insurance contract seeking reimbursement of their losses as well as statutory penalties and attorney fees pursuant to La.R.S. 22:658. After a four-day trial on the merits, the jury rendered a unanimous verdict in favor of USF & G answering "yes" to interrogatory number 1 which asked:
"Was the fire that burned Lanny and Faye Miley's house started by Arson?
Yes ___ No ___
If your answer is "No," go to question number 3.
If your answer is "Yes," go to question number 2."
The jury also answered "yes" to interrogatory number 2 which asked:
"Did the Mileys, or someone acting on their behalf, intentionally start the fire?
Yes ___ No ___"
Judgment was entered in conformity with the verdict. Plaintiffs filed a motion for JNOV, which was denied by the trial judge.
Plaintiffs appeal, alleging two assignments of error:
"A. The finder of fact was offered no motive or opportunity on the part of the plaintiffs as is required and defined by Louisiana jurisprudence in order to sustain an arson defense.
77 B. The finder of fact was not presented with sufficient rebuttal evidence to exclude the reasonable hypotheses offered as to the origin of the fire, and therefore misapplied the jury instructions."

ARSON DEFENSE
A denial of liability based on arson by a fire insurer sued on a fire insurance policy is an affirmative defense. Chisholm v. State Farm Fire & Casualty Co., 618 So.2d 1059, 1062 (La.App. 1st Cir.1993). The insurer bears the "burden of establishing, by convincing proof, that the fire was of incendiary origin and that plaintiff was responsible for it. An insurer need not prove its case beyond a reasonable doubt; it suffices that the evidence preponderates in favor of the defense." Rist v. Commercial Union Insurance Co., 376 So.2d 113 (La.1979). "Proof of motive plus establishment of the incendiary origin of the fire, in the absence of credible rebuttal evidence, is sufficient to sustain the affirmative defense of arson." Chisolm, 618 So.2d at 1062. Also arson may be proved by circumstantial evidence. The insurer need not prove its case beyond a reasonable doubt. Its circumstantial evidence need only exclude every other reasonable hypothesis than that the plaintiff is responsible for the fire. Sumrall v. Providence Washington Ins. Co., 221 La. 633, 60 So.2d 68, 69 (1952). Whether the insurer has adequately proved the arson defense is a factual determination. Del-Remy Corp. v. Lafayette Insurance Co., 616 So.2d 231, 234 (La.App. 5th Cir.), writ denied, 617 So.2d 941 (La.1993).
In arguing the first assignment of error appellants contend that USF & G offered no proof of motive or opportunity on the part of appellants to commit arson. In arguing the second assignment of error appellants contend: "In order for the jury to render a verdict for defendant, it would be necessary that no reasonable hypotheses were offered into evidence. Or, if such hypotheses were offered, it would be necessary that defendant rebut that evidence." Plaintiffs claim that they offered two reasonable hypotheses for the fire which were not rebutted by USF & G. One of the hypotheses offered was that unidentified third parties had a motive for destroying the Mileys' home: a disgruntled tenant who vandalized the family property or various business debtors of the Mileys, one of whom threatened to burn the Mileys' home. A second hypothesis was that the fire may have been electrical in origin.

a) Origin of fire
The record reveals that Brian Crain, the volunteer fire chief, stated that he learned of the fire at the Miley home at 10:20 *795 a.m. When he arrived at the scene 25 minutes later he saw only smoke. He did not see the flames burning through the roof. The first flames which he saw were in the kitchen area. He stated that he did not recall whether the Mileys asked him if he knew what caused the fire, and he was not trained to determine the cause. On the incident report which he was required to complete, Crain listed the cause of the fire as electrical. He explained that this was a "shot in the dark." He could just as easily have listed the cause as undetermined.
Todd Cooper was the first volunteer fireman to respond to the alarm. He brought the fire truck to the scene. Upon arrival, he observed smoke coming out of both ends of the house. He saw no flames until after he and two other firemen forced open a door to the house. At that time Cooper noticed a fire in the kitchen and dining room. Cooper stated that he never expressed an opinion to plaintiffs regarding the origins of the fire. Mr. Miley asked Cooper if the fire had started in the utility room, which was located behind the kitchen. Cooper responded "maybe" but he did not know how the fire started.
Chad Cooper, a volunteer fireman, arrived at the scene approximately ten minutes after being called. At the time of arrival he saw no flames burning through the roof; the flames were beginning to burn out of the rear of the house.
Kenneth Ray Jenkins, a neighbor, testified that he saw smoke coming from the Mileys' house. He immediately went over to the Mileys' to investigate. When he arrived at the scene he observed flames inside the house; he saw no flames in the bedroom; and he saw furniture and "house things" inside the house.
On October 13, 1992, W.F. Rayburn, state fire marshal and arson investigator, was requested by the Washington Parish Sheriff's Office to investigate the cause of the fire. He made the investigation approximately two weeks after the fire. Rayburn was accepted by the court as an expert in arson investigation. He testified that he suspected the fire had been caused by the use of a flammable liquid when he noticed an unusual burn pattern on the floor of the dining room (east end of house) and on a corner of the floor of a bedroom located at the opposite end (west end) of the house from the dining room. The significance of a "floor pattern" is that it indicates that a flammable liquid has been poured on the floor and ignited. As the fire spreads out it leaves a pattern on the floor, indicating that the heat was more intense in that area than other areas of the floor which burned. The damage in a normal fire would be more uniform throughout.
Mr. Rayburn also observed that some of the carpeting between the bedroom and the dining area did not appear burned. Consequently, in his opinion, the fire did not travel between the dining room and bedroom. He also concluded that the fire did not travel through the attic between the bedroom and dining room. This was apparent because if the fire traveled from the ceiling of one area through the attic and then down to the floor of the other, it would have burned through the roof. There was no evidence that the fire had traveled in this manner.
Rayburn stated that he did not take samples to test for the presence of an accelerant because he did not investigate the fire scene until approximately two weeks after the fire. It was uncontested that Gary Jones, an arson investigator hired by USF & G took samples for a laboratory to test for the presence of an accelerant. The test results were negative. Rayburn stated that the negative test results did not alter his opinion that the fire was caused by arson. Because he did not know the identity of the person or persons responsible for setting the fire, he closed the investigation.
Ronnie Landry was an independent adjuster employed by Crawford and Co. Landry's employer was contacted by USF & G to estimate the damages resulting from the fire. Landry went to the fire scene on October 13, 1992. On arrival at the scene, Landry learned that on the morning immediately after the fire, Mr. Miley was attempting to hire someone to bulldoze the foundation and remnants of the home. This aroused Landry's suspicions. He notified USF & G which, in turn, hired an arson investigator.
*796 Gary Jones, accepted by the court as an expert in fire cause and origin, was hired by USF & G to investigate the fire. He first visited the scene on October 15, 1992. At that time he obtained samples to submit to a laboratory for testing for the presence of accelerants. He was convinced that accelerants had been used to start the fire because vinyl (which was included in the samples taken at the scene) is not ordinarily consumed by fire unless something is added to it to sustain the fire. In his opinion, the fact that the lab was unable to detect the presence of accelerants did not mean that accelerants had not been used; they simply had not been detected in the samples presented for analysis. He further stated that it is not unusual to have negative laboratory results when testing for accelerants where there is a complete "burn through" as in the samples sent for analysis. Other factors which increase or decrease the chances of identifying an accelerant used to start a blaze are: the amount of water pumped on the fire (the greater the amount of water pumped on the fire the more likely to lose samples of the accelerant) and the time delay from the time of the fire to the time the sample was collected.
Jones stated that he observed distinct burn patterns on the floors of the den and bedroom which clearly showed that a flammable liquid had been poured on the floors of both. The distinct burn pattern for this type of fire is a clear line of demarcation between the burn and the burn surface. This differs from the pattern caused by material, such as a ceiling, falling to the floor and igniting a blaze. The burn pattern in that situation is more uniform.
Another reason for concluding that the fires were of incendiary origin was the "low level" burning in the areas of the den and bedroom. For example, the dresser and the sewing machine which were located in the corner of the bedroom, were charred at floor level. This indicates that the blaze was concentrated in the floor area.
Jones was convinced that the fire in the bedroom was of separate origin from that of the den because of the lack of uniform damage that would be caused by a fire moving from one end of the house to the other. The carpet was completely burned through in one corner of the bedroom and was virtually untouched in the opposite corner.
Jones examined the doors and windows to determine whether someone had possibly broken into the house and set the fire to perhaps conceal the commission of another crime such as a robbery. The window locks were intact and the windows were in the closed position at the time of the fire. The door locks were intact and in the locked position at the time of the fire. With the exception of one door, the doors were in the closed position when they burned. One of the doors had been forced open by the firemen and burned in the open position.
Jones checked the utility room and found no evidence of containers of a flammable liquid which could have fallen to the ground to cause the burn pattern on the floor. Jones ruled out the possibility that the fire was caused by electricity. An electrical fire does not cause irregular burn patterns on the floor. The burn patterns on the floor of the Miley home were inconsistent with those of an electrical fire caused by a faulty outlet which tends to burn in a "V" pattern towards the ceiling causing overhead damage. A fire caused by an electrical short exhibits a slow smoldering heat process as compared to that caused by an accelerant which has a rapid heat buildup, and makes a lot of smoke. Jones stated that the testimony of the witness, Rebecca Wheat, confirms the rapid heat buildup consistent with a fire started by an accelerant, rather than that caused by an electrical fire. Wheat did not see or smell smoke when she drove past the Miley house approximately twenty minutes before the fire was called in to the fire department. Because a smoldering fire emits lots of smoke, Mrs. Wheat would have been able to see or smell the smoke as she drove by the house with her car windows down.
The fact that the firemen saw no flames, only smoke, when they arrived at the scene (which would perhaps lead to the conclusion that the fire had been caused by electricity) was explained by the fact that the home was brick and energy efficient. This tends to contain the heat and flames. When the firemen *797 forced open the door and broke open the window panes, oxygen was fed to the fire causing the flames to immediately build up.
Jones also ruled out lightning as the cause of the fire, by checking with witnesses and the firemen regarding whether lightning or inclement weather had occurred near the time of the fire. The uniform response was no.

b) Motive or opportunity of plaintiffs
The record reveals that in 1992, USF & G had decided to stop writing policies in the state. A notice of nonrenewal was mailed to plaintiffs' address in Pine on October 4, 1992. Due to the nonrenewal, the policy was to expire on November 9, 1992.
In the bankruptcy petition the Mileys listed their home in Pine as an asset. The home was valued at $38,200. First State Bank held secured claims consisting of first and second mortgages on the home in the sum of $67,715.53. The personal property was valued at $18,408.60, including firearms and sports equipment valued at $800. By "Petition of Disclaimer and Abandonment" the bankruptcy trustee disclaimed and abandoned all rights, title and interest in the Mileys' home and two vehicles because they were encumbered in excess of their value and were not worthy of administration. The nonexempt personal and household goods were also disclaimed and abandoned as not being worthy of administration. The total loss from the fire claimed by the Mileys was $183,600. The replacement value of the home was $103,000. The personal property was valued at $102,000, including $3200 as the value of the gun collection.
While Mr. Miley was employed out of state, Mrs. Miley enrolled in an EMT class in Alabama. She later attended the University of South Alabama, majoring in nursing, and claimed to be a resident of Alabama for tuition purposes. At trial, however, she claimed to be commuting between her residence in Pine and Joelyon's apartment in Alabama. Mrs. Miley stated that she lied for tuition purposes when she applied to the University of South Alabama as an Alabama resident. She was really a resident of Pine. She stated she was in Alabama when the notice of nonrenewal of the USF & G policy arrived and did not receive it until after the fire. She stated that her daughter, Lanea, who was residing at the Pine residence, had not received the notice when she drove to Alabama to visit with her parents on the weekend before the fire. Mrs. Miley stated that Mr. Miley drove to Pine on Sunday morning, the day before the fire, to pick-up warm work clothes. He returned to Alabama at approximately 5:00 p.m. Sunday. She was notified by her sister-in-law of the fire between the hours of 9:30 and 10:00 on Monday morning. Mrs. Miley contacted Mr. Miley at work to tell him of the fire. They immediately drove to Pine. She stated that it was not until the trial that she learned the reason USF & G refused payment on the claim was because it suspected arson. However, adjuster Landry testified that sometime towards the end of 1992, Mrs. Miley told him that she had retained an attorney because she was under investigation for arson.
Mr. Miley testified that as a result of the bankruptcy his only debt in 1992 was the mortgage on his home. He went to the Pine home on Sunday, the day before the fire. On Sunday, on his way to Pine, he had car trouble and had to pour gasoline into the carburetor to restart, and had to change the fuel pump. He and two strangers who stopped to help siphoned approximately fifteen gallons of gasoline from his vehicle's fuel tank. A service station owner watched him do this and loaned him a container. He poured all of the remaining gasoline back into the fuel tank. He had no gasoline in any container with him when he got home.
Mr. Miley admitted that he asked his son-in-law to move his prize gun collection from the house into the shed. He testified this was to hide the guns from possible burglars who would know that no one would be home during the week that Stafford was hunting in Colorado. Apparently, Stafford never placed the guns in the shed. He hid them throughout the house. After the fire the remnants of the guns were found throughout the house. Coincidentally, the shed where the guns would have been hidden had Stafford followed Mr. Miley's instructions, did not burn.
*798 Upon arriving at the fire scene, Mr. Miley stated that the remains of the house were still smoking and he was afraid the nearby woods would catch fire. He used the water hose and "separated the places that were still burning next to the edge of the slab to prevent the wind from blowing it, catching the woods on fire, and setting my shed on fire and my shop."
The replacement value of the home as presented to USF & G was $103,000.
This differed from the $38,200 value assessed in the bankruptcy proceeding. Miley was asked "You indicated, sir, in the bankruptcy under perjury, it's worth $38,200.00 to the Federal Court. Are you saying you perjured yourself at that time?" Miley responded "I could have, yes, sir, under the attorney saying, you know, let's do it like this.... Attorneys is like we might call it a snake in the grass, Mr. Lawler. Do you know what I mean? You have to go along with an attorney because you suppose that he knows what he is talking about."
The gun collection which was lost in the fire was not listed in the bankruptcy proceedings, unless as part of "firearms and sports equipment" valued at $800. Miley could not remember whether he mentioned the collection as such to the lawyer who handled his bankruptcy. He admitted to seeking someone to bulldoze the remains of the house but denied asking anyone about it on the afternoon of the fire. It was probably a week after the fire. He was asked "A week after. Could it have been the day of the fire, Mr. Miley?" He responded "Could have been. He could have stopped that day. There was several people stopped that day."
Miley stated that he knew of no one who had reason to burn down his home; he did not suspect anyone of burning it down; nor did he tell the Fire Marshal during the investigation that he suspected any particular person of setting the fire.
There were additional contradictions in the testimony of Mr. and Mrs. Miley that their residence was in Pine and they stayed temporarily with daughter Joelyon at her apartment in Alabama. The lease contract on Joelyon's apartment was signed by Joelyon as the lessee and Mr. Miley as the guarantor. However the rent was often paid by the Mileys rather than Joelyon.
The phone service on their Pine home had been disconnected on October 15, 1990. On August 21, 1991, a phone was connected at that same address in the name of Lanea Stafford. It was subsequently transferred from that address to the adjacent address of the Staffords' new home on October 8, 1992. Lanea stated that she was still remodeling and had not yet moved into her home but had the phone transferred to that address four to five days before the fire so that her husband would not miss calls from his boss while they were working on the remodeling project at night. She said they continued to live at her parents' home until the fire because they had not yet completed remodeling.

Proof of Arson
This court has held that "[p]roof of motive plus establishment of the incendiary origin of the fire, in the absence of credible rebuttal evidence, is sufficient to sustain the affirmative defense of arson." Chisolm, 618 So.2d at 1062.
Considering the record in its entirety, the jury's finding in this regard is reasonable and it is not manifestly erroneous. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880 (La. 1993).
The jury's implicit finding that Mr. Miley had motive to set the fire was not manifestly erroneous. He had declared bankruptcy and still owed a debt on the home. The insured value of the home exceeded the debt owed on the mortgage. The Mileys had moved to Alabama where Mrs. Miley was enrolled in nursing school and they had apparently vacated the Pine home. The jury could have found that Lanea had completed the remodeling and moved into her remodeled home, vacating her parents' home. Also the jury could have found that before the fire the Mileys had received notice of the nonrenewal of the insurance policy.
Nor was the jury manifestly erroneous in its implicit finding that Mr. Miley had the *799 opportunity to set the blaze or to have someone set it on his behalf. Both Mr. and Mrs. Miley were caught in several inconsistencies, even involving lying to the Bankruptcy Court. The jury could have disbelieved the testimony of the Mileys regarding Mr. Miley's return to Alabama on Sunday night. Further Mr. Miley himself denied knowing of any third person who would have a motive to burn Miley's home.
Accordingly, the jury was not manifestly erroneous in determining the arson defense was adequately proved by the insurer, USF & G. Del-Remy Corp. v. Lafayette Insurance Co. 616 So.2d at 234.[3]

ANSWER TO APPEAL
Defendant by answer to appeal challenges the trial court's refusal to award certain costs on defendant's rule to tax costs.
We first note that the trial court's judgment awarded all costs to defendant. That award of costs is "reviewable under the appeal" by this court, C.C.P. art. 2088, and the trial court therefore lost jurisdiction over it (save to "set and tax", meaning to fix their amount and to decide whether or not collectible from the party cast for costs). To the extent that the trial court's second judgment, on the rule to tax (C.C.P. art. 1920), cast defendant for, or denied defendant, taxable[4] costs (such as jury costs and the reasonable costs of experts who testified at trial, but not of those who did not, nor of depositions not there introduced, R.S. 13:4533), it amounts to a partial reversal of the first judgment's award of all costs to defendant, and it is therefore null for lack of jurisdiction. This court has authority to issue any needful writ in aid of its jurisdiction, La. Const. art. V sec. 2, and its jurisdiction is infringed by the trial court's second judgment. We therefore vacate that second judgment and remand for further proceedings consistent with this opinion.

DECREE
The judgment appealed from is affirmed at appellants' cost, and the judgment on rule to tax costs is vacated and that rule remanded for further proceedings consistent with this opinion.
JUDGMENT ON MERITS AFFIRMED; JUDGMENT ON RULE VACATED AND REMANDED.
NOTES
[1] Judge William V. Redmann, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] At trial, Mrs. Miley refers to the home's location as Pine, La. The petition refers to the location as Angie, La.
[3] Because we have affirmed the judgment of the trial court we need not discuss the issue of damages raised by appellants in brief.
[4] See C.C. arts. 3195 et seq. on the privilege for "law charges," defined by art. 3195 as the costs of litigating "which the party cast has to pay to the party gaining the cause." The intervening articles specify many chargeable costs, and art. 3198 adds: "Not only has the creditor no privilege for the costs which are not taxed ... but he has no right to demand them even from the debtor."