PARRO, J.
Instate Farm Mutual Automobile Insurance Company (State Farm) appeals a judgment that granted Nakoosha Albert a property damage award of $36,333.07, plus interest and costs. After reviewing the entirety of the record and applicable law, we reverse that judgment and render judgment in favor of State Farm on its reconventional demand.
FACTUAL AND PROCEDURAL BACKGROUND
On September 9, 2006, shortly before midnight, Nakoosha Albert was allegedly held up at gun point while at a car wash located at North Foster Drive and Prescott. Albert claimed her 2002 Cadillac Escalade was stolen at that time; she called 911 to report the theft at 11:54 p.m. A minute later, there were numerous other phone calls to 911 about a vehicle on fire on the other side of Baton Rouge at Olympia Stadium, which is located on the corner of Perkins Road and Kenilworth Parkway.
On September 10, 2006, Albert filed a claim against State Farm, her insurer. However, investigations by the Baton Rouge Fire Department and State Farm’s investigator revealed arson. Therefore, State Farm denied her claim under an exclusion provision in the policy for concealment or fraud.
Albert filed suit against State Farm for damages, including allegations that State Farm was arbitrary, capricious, or without probable cause in rejecting her claim, thus entitling her to penalties and attorney fees. State Farm answered the suit and denied her claim. State Farm later filed a reconventional demand against Albert, alleging that it was entitled to recover its expenses of investigation, including court costs and pre-suit attorney fees.
State Farm filed a motion for summary judgment to dismiss Albert’s allegations on the grounds of bad faith. The trial court denied the motion and, without considering the merits, urged State Farm to pay Albert. State Farm’s writ application to this court on the denial of the summary judgment was denied. State Farm requested a jury trial, but Albert moved to strike the jury, ^acknowledging that the amount in controversy did not exceed $50,000. After a bench trial, the court found that State Farm did not appear to be in bad faith and denied Albert’s claim for penalties and attorney fees, but ruled in her favor on her property loss claim, ordering State Farm to pay her $36,333.07, plus interest and court costs.
State Farm timely appealed the judgment, raising the following assignments of error: (1) the trial court committed manifest error in concluding that Albert was not involved in the theft and burning of her Escalade, despite overwhelming and unrefuted evidence to the contrary; and (2) the trial court committed error in refusing to render a judgment in favor of State Farm, pursuant to its reconventional demand based on Albert’s bad faith.
STANDARD OF REVIEW
A court of appeal may not overturn a judgment of a trial court absent an error of law or a factual finding that is manifestly erroneous or clearly wrong. Morris v. Safeway Ins. Co. of Louisiana, 03-1361 (La.App. 1st Cir.9/17/04), 897 So.2d 616, 617, writ denied, 04-2572 (La.12/17/04), 888 So.2d 872. In order to affirm the factual findings of the trier of fact, the supreme court posited a two-part test for the appellate review of facts: (1) the appellate court must find from the record that there is a reasonable factual basis for the finding of the trier of fact; and (2) the appellate court must further determine that the record establishes that the finding is not clearly wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120, *1007 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trier of fact’s finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a factual finding only if, after reviewing the record in its entirety, it determines the factual finding was clearly wrong. See Stobart v. State, through Dep’t of Transp. and Dev., 617 So.2d 880, 882 (La.1993); Moss v. State, 07-1686 (La.App. 1st Cir.8/8/08), 993 So.2d 687, 693, unit denied, 08-2166 (La.11/14/08), 996 So.2d 1092. If 14the trial court’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse those findings even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Hulsey v. Sears, Roebuck & Co., 96-2704 (La.App. 1st Cir.12/29/97), 705 So.2d 1173, 1176-77. However, an appellate court may find manifest error or clear wrongness in a finding purportedly based upon a credibility determination, where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story. Id. at 1177.
FIRST ASSIGNMENT OF ERROR
Louisiana law places the burden on the plaintiff to establish every fact essential to recovery and to establish that the claim falls within the policy coverage. Evins v. Louisiana Farm Bureau Mut. Ins. Co., 04-0282 (La.App. 1st Cir.2/11/05), 907 So.2d 733, 734. However, when an insurer raises the affirmative defense of arson, the burden shifts to it to prove that the fire was of incendiary origin. By raising the affirmative defense of arson, the insurer has the burden of establishing that the fire was of incendiary origin and that the plaintiff was responsible for it. An insurer need not prove its case beyond a reasonable doubt; it suffices that the evidence preponderates in favor of the defense. Rist v. Commercial Union Ins. Co., 376 So.2d 113, 113 (La.1979). Proof, of course, may be and invariably is entirely circumstantial. Id. at 113. Proof of motive, plus establishment of the incendiary origin of the fire, in the absence of credible rebuttal evidence, is sufficient to sustain the affirmative defense of arson. Miley v. United States Fid. and Guar. Co., 94-1204 (La.App. 1st Cir.4/7/95), 659 So.2d 792, 794, writ denied, 95-1101 (La.6/16/95), 660 So.2d 436.
Albeit was the only witness who testified in support of her claims. She stated at trial that on September 9, 2006, her 2002 Cadillac Escalade was Rstolen from her at gunpoint. According to Albert, she picked up her Escalade from storage early in the afternoon and decided to go to a Southern University football game scheduled to begin around 7:30 p.m. However, she did not leave her house in New Roads until well after the game started, and she did not have tickets to the game. She said that when she arrived, the game appeared to be over, so she drove around the Southern University campus for a while and then drove past several night clubs in the area, but did not see anyone she knew and eventually left.
Albert further stated that she then went to a car wash to vacuum some chips she had just spilled in her car. She said that she first went to a car wash on Plank Road, but the vacuums were all being used, so she went to a car wash on Prescott and North Foster Drive. There, after she had gotten out of her car, someone in a brown Oldsmobile pulled up behind her car, ran up to her, placed a gun to her head, and shouted, “Give it up!” She said there were definitely two, maybe three, black men wearing black hoods, and the one who had the gun had a red bandana *1008 around his face. Albert testified that she was in shock and let them take the Esca-lade, which still had the keys in the ignition. She stated that they told her to go to the back of the car wash. She did as they said, and then waited there twenty to thirty minutes before realizing her cell phone was in her pocket and calling 911. The police arrived and took her to a substation where she called her aunts, Capri-cia Carter and Vanessa Albert, to pick her up. The next day, she filed a claim with State Farm for her stolen vehicle.
State Farm put on many witnesses and cross-examined Albert, whose in court testimony was inconsistent and contradicted in many ways her sworn affidavit and statements to investigators. One significant inconsistency involved how long she waited to call the police. While she stated at trial that it took her 20 to 30 minutes to call the police, in her signed affidavit, Albert stated that she immediately called the police to report the robbery. Other witnesses confirmed Rthat Albert had told them she immediately called the police.
Officer Jessie Barcelona of the Baton Rouge City Police was the officer who responded to the 911 call. He was dispatched at 11:57 p.m. Barcelona stated that Albert could not give him any details regarding the height and weight of the suspect or suspects. Although Albert said at trial that the car that pulled up was a brown Oldsmobile, Barcelona could not get any information on the night of the robbery about the kind of car that pulled into the car wash, even after he prompted her with questions concerning whether it was a large car or a small car. She never gave him a make or color of the car and could not tell him which direction that car or her Escalade went after the robbery. Also, although Albert testified at trial that her car had On-Star on it, from which the vehicle’s location could have been ascertained, she did not give this information to the investigating officer. At trial, Albert stated that the suspects were all wearing black hoods and one had a red bandana covering his face, but all she told Barcelona at the crime scene was that the men were wearing black hooded sweatshirts. There was no mention of the red bandana. Also, in her sworn affidavit, Albert stated that she heard the tires skid as the suspects pulled off. However, Barcelona said there were no tire marks at the scene. Barcelona stated that usually victims of armed robberies have an imprinted mental picture of some part of the event, but Albert could not recall any details. He also said she changed her story several times during his interview. In fact, Barcelona told Albert that he did not believe she was being truthful and that he was putting in his report that she had discrepancies in her statement.
When this incident occurred, Gary Thompson was captain of Station 10 of the Baton Rouge Fire Department. His station responded to a 911 call regarding an SUV on fire at Olympia Field and was dispatched at 11:58 p.m. Before his truck arrived at the scene, he could see an orange glow in the sky. He stated that he called for an arson investigator before he got off his truck, due to the suspicious nature of the fire. Thompson claimed he was 17immediately alert to the possibility of arson, because it was unusual to find a vehicle burning at midnight in an isolated location with no one around.
Darryl Sanders was the arson investigator for the Baton Rouge Police Department who worked Albert’s case. According to him, the fire burned between twenty and thirty minutes before it was extinguished. It was his opinion that the fire was started in the interior and then moved to the exterior. The custom chrome grill that Albert had on her car on September 9, 2006, was not on the car when it burned. *1009 Sanders said that it would not have melted, but would have been intact and discolored. He also noted that the custom spinning rims that Albert had on her car were not on the car when it burned. The wheels and rims on the car were factory wheels and rims; there also was no evidence of the after-market sound system that Albert had in her car. With regard to the tires and rims on the car, Sanders stated that the tires all matched and all but one had all of the lugs on it.
Sanders testified that as part of his investigation, he drove from the car wash on North Foster to Olympia Stadium, taking various routes. He stated that it took him between seventeen and twenty minutes to make that drive, and that even if a driver were speeding and ignoring all of the red lights, the fastest time for this drive would be between twelve and thirteen minutes.
Sanders concluded that the fire was of an incendiary nature and that Albert was either directly or indirectly involved in the burning of her vehicle. His conclusion was based, in part, on the time involved. He said that it was not physically possible to do the series of events that occurred following the theft of the car, using Albert’s estimate of the time and the records of the 911 calls. To get to Olympia Field from North Foster and Prescott would have taken at least twelve minutes. He estimated the fire had burned over twenty minutes before it was put out by the Fire Department, and the fastest the vehicle could burn if completely doused in fuel would be ten to thirty minutes. It would also have taken at least fifteen minutes in a professional setting with the vehicle on a 1¡¡rack, for four people to remove the custom rims, which had special locking lug nuts, and to replace them with the factory rims. Furthermore, there were no markings from any type of car jack, which suggested to him that the tires were probably removed at a different location. He also stated that he checked serial numbers on the car and the tires, and learned from the local Cadillac dealership that the four tires on the vehicle were the factory set. Finally, the car was found in a vacant area, and no one was around, making this situation highly suspicious.
William Crenshaw, the estimator for State Farm, testified that the rims on the vehicle were the factory rims that were on that vehicle when it was manufactured. Crenshaw said he also had called the Cadillac dealership and, by using the VIN number and parts numbers, learned that the rims that were on the car when it was found were the same factory rims the car came with. Albert testified that she had sold the factory rims; however, her mother testified that she had kept them. Furthermore, in her sworn affidavit, her aunt, Capricia Carter, stated that Albert kept the factory rims in storage. Crenshaw also stated that Oldsmobile rims could not fit on an Escalade.
Albert testified that the vacuums were located at the front of the car wash. However, Ronald Huey, the insurance fraud investigator for State Farm, stated that the vacuums were located at the back of the car wash. Further, Albert stated that the carjackers had pulled up behind her, but according to Huey, that would be virtually impossible, because the vacuums were close to a fence and if the Escalade had been parked facing North Foster, as Albert claimed, another car could not have pulled up behind it. Huey also testified that the distance from the ear wash to Olympia Field was right at eight miles and that there were at least twenty traffic signals along the route that he took, which was the most direct route between the two locations.
Lisa Barras, the claims representative for State Farm, was the person who ultimately decided to deny Albert’s claim. *1010 She said some of the facts she |3considered in reaching this decision were that the policy was less than one year old, the car was customized, and the car was recovered a very short time after Albert reported it stolen. Though the car had been customized, Barras, like the other witnesses, stated that the custom grill, spinning rims, and sound system were not on the car when it was burned. Barras listened to the tape of the 911 call and noticed that Albert was very calm and collected during the call, even pointing out during the call that she had custom rims on her car. Barras also stated that during the 911 call, Albert said that the armed men also stole her debit card. However, Albert testified at trial that she did not have her debit card with her at the time of the robbery.
With reference to the plausibility of the factual circumstances, Barras testified:
Those rims and tires that she had on there weigh approximately a hundred and five pounds apiece.
[[Image here]]
To find the locking lug nut, to undo those, take every one of those lugs off, then put these rims that are on there, which we’ve determined are factory rims to this make and model year vehicle, that picture that’s in the Mitchell book, matches the rims on the vehicle when it was discovered burned.
My experience is a thief who steals a vehicle and strips it, he’s going to drop it to the ground. They are not going to take the time to put another tire on there, unless it’s a mismatch and they did the deed somewhere else and they take it somewhere else to burn it. But, you’re talking about a ton of time to do that.
You can’t physically do what’s been presented to State Farm. You cannot, and the one thing that I could not do is overcome, you’ve got to have a car-jack-er with four Cadillac rims that match her vehicle in an Oldsmobile car, riding around Baton Rouge looking for an Es-calade to car-jack, so that you can put those rims back on it.
I could not get past that in my investigation. [M]y recommendation was ... to deny her claim, because she had to be directly or indirectly involved in the burning of her vehicle.
Barras also considered Albert’s financial status and whether she stood to gain from this incident. Albert was six months pregnant, unmarried, and unemployed. She had almost no funds in her checking account. Although |10Albert had taken classes to become a physical therapist, she had twice failed the exam that would allow her to be certified in that profession. A few years earlier, Albert had received a personal injury settlement and had put some of that money into the Escalade. She had gone through $75,000 to $80,000 within a two-year time span and had some NSF charges and unpaid medical bills turned over to collection agencies. Albert lived with and was totally dependent on her mother. She stood to receive approximately $87,000 for the loss of her vehicle from State Farm. Barras testified that the amount State Farm was required to pay under its policy was based on the retail value of the car, which is substantially more than an owner could get on a trade-in or by selling it on the street. State Farm used the Kelley Blue Book to estimate the value, which included the value of the custom equipment and paint job Albert had on the car. Barras also took into consideration the fact that Albert had another car, a 2002 Ford Escort that she had purchased for her mother, which was totally available for her use, because her mother no longer drove. So she was not dependent on the Escalade for her transportation needs.
*1011 In addition to all of the discrepancies that the police and firemen found, there were also inconsistencies in what Albert told her family. While Albert said that her aunts picked her up from the police station, her aunt Vanessa Albert said she did not pick her up. Her mother, Paulette Albert, stated that Albert told her that someone had hit her on the interstate and had taken the car when she got out to investigate. Caprieia Carter, Albert’s other aunt, said that when she picked Albert up from the police station, Albert told her that someone had rear-ended her on Plank Road and had taken her car when she got out to investigate.
Albert’s story in this case was contradicted time and time again. Not only was her account of the situation inconsistent, but the evidence presented by the defense in the form of testimony and photographs refuted her claims. The objective evidence showed that it was physically impossible for the |,icircumstances to have unfolded in the manner she described, and, based on this evidence, Albert’s story was implausible on its face. Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989); see also Hulsey, 705 So.2d at 1177. Our review of the entirety of the record leads us to conclude that a reasonable fact finder would not credit Albert’s story, and we find manifest error or clear wrongness, even though the trial court’s finding was purportedly based on a credibility determination.
The State Farm policy insuring Albert’s car had a “Concealment or Fraud” clause, which stated, “There is no coverage under this policy if you or any other person insured under this policy has made false statements with the intent to deceive in connection with any claim under this policy.” With reference to State Farm’s arson defense, it is undisputed that the fire was deliberately set. Since the origin of the fire was of an incendiary nature, State Farm had only to provide evidence of Albert’s motive in order to satisfy its burden of proof and deny coverage. Albert was pregnant, unemployed, and had financial difficulties. State Farm would have paid her approximately $37,000 for the loss of her SUV, which was more than the Kelley Blue Book value and more than she could have gotten if she sold it. She had another vehicle, so she was not dependent on the Escalade for her transportation needs. These facts are sufficient to establish that Albert had motive to destroy the vehicle in order to obtain the insurance proceeds. Additionally, there was no evidence that anyone else would benefit from the fire; indeed, it is nonsensical to suppose that the persons who stole the valuable Esca-lade would immediately turn around and burn it to the ground, salvaging only the special custom equipment with which it was equipped. Having established Albert’s |12motive and the incendiary nature of the fire, and in the absence of credible rebuttal evidence, we conclude that State Farm carried its burden of proof to sustain its affirmative defense of arson. See Childs v. Zurich American Ins. Co., 476 So.2d 403, 407 (La.App. 2nd Cir.), writ denied, 479 So.2d 920 (La.1985); see also Miley, 659 So.2d at 794. Therefore, the judgment in favor of Albert must be reversed.
SECOND ASSIGNMENT OF ERROR
State Farm brought a reconven-tional demand against Albert for the expenses of investigation, pre-trial attorney fees, and costs incurred in connection with *1012 Albert’s claim, such as payment to her for a rental vehicle. In Fuselier v. United States Fid. & Guar. Co., 301 So.2d 681 (La.App. 3rd Cir.1974), and Russell v. Niagara Fire Ins. Co., 129 So.2d 545 (La.App. 2nd Cir.1961), the insurance company defendants prevailed on their arson defense, and the courts found that they were entitled to judgments on their reconven-tional demands against the plaintiffs for the amounts they had expended in connection with the plaintiffs’ claims, including attorney fees and interest,[1] Barras testified that State Farm had rented a vehicle for Albert’s use and had paid approximately $400 in rental fees. State Farm also presented evidence that its attorney fees during the investigation prior to suit were $2,513.24. Accordingly, State Farm is entitled to an award of $2,913.24, plus interest from the date its reconventional demand was filed, and all court costs attributable to these proceedings in the district court and this court.
CONCLUSION
Based on the foregoing, we reverse the judgment signed May 12, 2009, and dismiss Albert’s claims against State Farm with prejudice. We render judgment in favor of State Farm on its reconventional demand in the amount of 11S$2,913.24, plus interest from July 17, 2008, and all costs of this litigation in the district court and this court.
REVERSED AND RENDERED.

. Although these cases involved fire insurance policies, and the reconventional demands were for mortgage indebtedness on the fire-damaged property, the principle of awarding the insurers the amounts they had spent or incurred in connection with the claims and their arson defenses is equally applicable to the facts before us.