Plaintiffs sold their property to the defendant, and now they bring this suit to have the sale set aside and declared only a mortgage for the purchase price.

Of course they charge fraud, because otherwise parol evidence would not have been admissible to vary the terms of the deed. Waller v. Dawson, 162 La. 804, 111 So. 170. But they have not proved it, and we believe, as the district judge did, that plaintiffs knew quite well that they were selling their property and not mortgaging it.

The judgment appears to us correct.

#### Decree.

The judgment appealed from is therefore affirmed.

(138 So. 843)

**GIGLIONE v. NORWICH UNION FIRE INS. SOC., Limited.**

No. 31221.

Nov. 3, 1931.

Rehearing Denied Jan. 4, 1932.

Loys Charbonnet and Walter W. Wright, both of New Orleans, for appellant.

St. Clair Adams, of New Orleans, for appellee.

ROGERS, J.

The suit is on a fire insurance policy for the total destruction by fire of the premises No. 3440 Henry street, in the city of New Orleans. The amount sued for is $14,000, the face of the policy, including a claim on an alleged loss payable clause covering a mortgage indebtedness of $4,000.

The defense is that plaintiff violated the terms of the policy by failing to furnish proof of loss, and that plaintiff either set fire to the building or caused others to do so. Defendant admitted, in its answer, the issuance of the loss payable clause, but alleged that it had been satisfied and canceled prior to the fire.

The trial judge rejected plaintiff's demand, finding as facts that plaintiff and his son set fire to the premises and that the loss payable clause had been canceled by the mortgagee. From this judgment plaintiff appeals.

The case involves only issues of fact, and we do not find anything in the record to warrant us in disturbing the judgment of the trial judge.

The testimony conclusively shows that the fire was of incendiary origin. This is admitted by plaintiff, who contends, however, that inasmuch as neither he nor any member of his family was home at the time, he is not called upon to explain the fire, the burden being on the defendant to prove that plaintiff set the building afire or caused others to do so, which burden defendant has failed to sustain.

The fire occurred on Monday morning, March 29, 1926, at about 1:45 o'clock. At about 9:15 o'clock on Sunday night, March 28, 1921, an unknown woman telephoned the Tenth Precinct Police Station and informed

the clerk in charge that a fire would probably take place at No. 3440 Henry street some time during that night. The police clerk immediately conveyed the message to the fire marshal, who ordered that two policemen be sent to guard the premises. This was done, but the officers returned, being unable to locate the house, which was in a sparsely settled section of the city. The fire marshal, on being informed of the fact, arranged to send Deputy Fire Marshal Dalton, now dead, and Patrolman John G. Fleming to investigate the matter.

When these officers got within about half a block of the house, they saw a man run from out of the grass carrying a ball of fire, which he threw into the house through the front entrance. Running in the direction of the house, the officers also saw another man throw a ball of fire into it. The premises immediately became a mass of flames. The officers pursued the men, firing several ineffectual shots at them. One of the men was large and the other small; the large man was wearing a cap and an army overcoat and was afflicted with a limp. Dalton then telephoned the fire department, while Fleming examined the neighborhood. The alarm was promptly responded to by Engine Company No. 3, located about fifteen blocks from the scene of the fire, the members of the company being on the alert, because of a mysterious telephone message received at the engine house about 9:15 o'clock that night that a fire was about to occur.

About the time the fire engine arrived on the scene, plaintiff and his son appeared, and were immediately recognized and identified by the officers as the two men who threw the balls of fire into the building. Plaintiff, who is a large man, was wearing a cap and army overcoat and limped. His son is a smaller man. Both men were arrested on the spot.

Plaintiff set up an alibi in contradiction of the testimony offered on behalf of defendant, plaintiff claiming that neither he nor his son could have fired the house, because they were at the home and place of business of Tony Lorio, plaintiff's cousin, from 5 o'clock p. m. to 2 o'clock a. m. on the night of the fire. Tony Lorio operated a negro grocery and negro gambling club at No. 1800 North Johnson street, a distance of about twenty-five blocks from the premises No. 3440 Henry street.

Plaintiff testified that Tony Lorio left that Sunday morning to attend to some business at Bogalusa and had requested him to stay at his house with his family while he was away. Plaintiff had sent his wife and two daughters to Tangipahoa parish, ostensibly to pick strawberries, nine or ten days before.

Plaintiff's story is that on Sunday, March 28, 1926, he delivered ice in the morning, returning home at noon. That he remained home until 2 o'clock, when he left with his son, the latter to play pool on Spain street, and plaintiff to visit his brother-in-law, and then to report with his son at Lorio's place at 5 o'clock in the evening. Plaintiff testified that he left Lorio's place at 2 o'clock the next morning. The wife and daughter of Lorio and two negroes testified to the same effect. Plaintiff's son did not testify at the trial, being confined at the time in an insane asylum. Plaintiff does not refer to any incident that would enable him to fix the time of his departure from Lorio's other than that he left there after 12 o'clock. Mrs. Lorio, however, testified on the trial of the case that she knew it was 2 o'clock because she looked at a clock. But in her examination before the fire marshal some five years before she testified that she knew the correct time because as her son closed the door he looked at his watch to see what time it was, and that she

also saw the bread man come in. The daughter of Mrs. Lorio testified that she also consulted a clock and for that reason knew it was 2 o'clock when plaintiff and his son took their departure. The two negro witnesses called by defendant were Philip Le Doux and Roger Meare. The former was a gambler and the latter was the manager of Lorio's club. Both witnesses had police records. Le Doux testified that he left the club at 1:30 o'clock and plaintiff remained. He said he remembered the exact time, although five years had elapsed, because a friend of his going in the same direction looked at his watch and exclaimed, "It is 1:30, let's go." Meare, the manager, testified as to the watch incident referred to by Le Doux, and stated that he left the club at 20 minutes of 2 and plaintiff remained.

The trial judge, who saw and heard the witnesses, did not believe their story. Nor do we. The remarkable unanimity with which by consulting watches and clocks they fix the exact time of the departure of plaintiff and his son from Lorio's establishment is almost enough to discredit their testimony. And certainly their testimony cannot be accepted as true by the court as against the testimony of credible witnesses that plaintiff and his son were actually present at the scene of the fire at and before 2 o'clock in the morning.

The record negatives the existence of a motive in any person other than plaintiff to burn his house. Plaintiff had no enemies, and he is the only person who could profit as a result of the fire. The property was purchased for $11,000 by plaintiff a little more than a year prior thereto. The insurance on the building was $14,000, or $3,000 more than the cost of the land and the building together. The record discloses that there was very little furniture in the house, although plaintiff carried insurance of $2,200 on his household effects.

No one had access to the house but plaintiff and his family. And plaintiff's wife and daughters had a short time before been sent to Tangipahoa parish, plaintiff and his son being the only occupants of the house at the time of the fire. A truck used by plaintiff for the delivery of ice had been removed from the premises a few months before the fire; and a horse or mule apparently stabled in the back shed had also recently been removed.

The testimony showed the presence of gasoline in the building. And its interior was evidently well saturated with gasoline or other inflammable material and the house well filled with such material, because it was completely destroyed in a very short space of time. Notwithstanding the prompt sounding of the alarm and the unusual speed exhibited by the fire department in responding thereto, the entire house was ablaze when the firemen arrived on the scene. Their unanimous testimony is that it was an exceedingly fast fire; some of the witnesses testifying that it was the quickest fire within the range of their experience. And this was so in spite of the fact that it was raining at the time and had been raining all that day and every day for a week previous and the exterior of the house, which was constructed of wood, must have been well soaked with water.

The loss payable clause originally attached to the policy was issued in favor of Louis Pisciotta, plaintiff's vendor. The clause shows by an indorsement on its face that the mortgage had been satisfied and the clause canceled by Pisciotta. The mortgage for $4,000 referred to in plaintiff's petition was executed subsequently, and at no time was the defendant requested to issue a new loss

payable clause in favor of the holder of this mortgage.

For the reasons assigned, the judgment appealed from is affirmed.