## WILSON v. ÆTNA INS. CO.
### No. 5040.

Court of Appeal of Louisiana. Second
Circuit.
June 4, 1935.

Hugh Tullis, of Vidalia, for appellant.

St. Clair Adams & Son, of New Orleans,
for appellee.

MILLS, Judge.

Mrs. Florence Wilson was the unconditional owner of a small 3-room dwelling and two lots, adjacent to the levee in Vidalia, La., upon which it stood. It becoming necessary to move the levee so as to occupy a portion of these lots, the board of commissioners, in the summer of 1933, appropriated the whole property, paying its assessed value of $800. Only the back part being immediately needed, Mrs. Wilson was permitted to move the house onto the front and occupy it until required for levee purposes. With a part of the consideration, she purchased, for $175, two small houses, also ordered moved, and placed them on the lots, one on each side of

and about 30 feet from her dwelling. These two houses had been insured for $700 and $300, respectively, by the Ætna Insurance Company, but the policies had lapsed. After having been notified by the levee board that they needed the whole premises and that she would have to move all the houses off the lots, she went to Ferriday, and on May 2, 1934, renewed these policies, or had new ones issued for the same amount. She failed to inform the agent that she had been ordered to move the buildings. On April 14, 1934, she had insured the middle house in Vidalia for $500, paying only a part of the premium. She completed the payment of the premium, which was required before the policy would be delivered, just a few days before May 15, 1934, when, at 2:30 a. m., all three buildings were destroyed by fire.

Payment being refused by the insurers, she brings suit against the Ætna for $1,000, and against the Royal Insurance Company, Limited, for $500, claiming in each case an additional sum for penalties and attorney's fees. The suits are consolidated for trial, and are resisted on two grounds:

First, that plaintiff either set fire to the houses or caused some person to do so for the fraudulent purpose of collecting the insurance, and in violation of the contract; and

Second, that the interest of plaintiff was not that of unconditional and sole ownership, and the buildings insured were not on ground owned by plaintiff in fee simple as required in the policies.

The trial judge in a well-considered written opinion found that the fire was of incendiary origin, but that defendant did not make out, by a preponderance of the testimony, that plaintiff caused it. Plaintiff's demands were rejected on the second issue and judgment rendered accordingly, from which she prosecutes this appeal. Defendants contend strenuously that both issues should have been decided in their favor.

■ It is well settled that only a preponderance of the evidence is required to prove incendiarism in a civil case, for the reason that where no life or liberty is at stake the court cannot indulge in undue lenience toward either party without injustice to the other. Catalanotto v. Minneapolis Fire & Marine Ins. Co., 15 La. App. 320, 131 So. 705; Picoraro v. Insurance Co. of State of Penn., 175 La. 416, 143 So. 360.

■ The fire was of incendiary origin. It broke out simultaneously in the two end, un-

occupied houses. All were without gas or electric connections. Such a coincidence could not reasonably have resulted from chance. The record negatives the existence of a motive in any other person, and establishes a very strong motive in plaintiff. The existence of a motive in plaintiff alone is a weighty element in the proof of arson. Picoraro v. Insurance Company, supra; Giglione v. Norwich Union Fire Ins. Soc., 173 La. 801, 138 So. 843; St. Philip v. Lumbermen's Ins. Co. of Philadelphia, 18 La. App. 331, 137 So. 359.

■ While in practically destitute circumstances, plaintiff paid the premiums for excessive insurance on these houses, knowing that she must immediately move or destroy them. She had made no arrangements to move them, though there is some testimony that she had inquired about the price of lots. The fact that the evening of the fire she had moved out a quantity of furniture for shipment to Baton Rouge, where she had a house rented, negatives the idea that she intended to remain in Vidalia. The day before the fire she moved to a neighbor's house a floor lamp, a porch rocker, and a kitchen cabinet. A few days before she had sold a small bed, mattress, and dresser. She failed to call to the stand in rebuttal her two sons, aged 13 and 16, who occupied with her the middle house. It is not shown that she had any enemies.

To our mind, the powerful motive in plaintiff, the total absence of incentive in any one else, the coincidence of the fire breaking out simultaneously in the two houses in which she alone was interested, the over insurance and the circumstances surrounding its procurement, establish a clear preponderance of the testimony which is not overcome by plaintiff's denial, weakened by her failure to call to the stand her two sons, aged 13 and 16, who lived with her. The removal of the furniture is significant, but is perhaps explained by her necessity for moving. We conclude that the only reasonable hypothesis which can be drawn from this evidence is that plaintiff, in violation of her contract, caused the destruction of the property insured. . . .

The learned trial judge in his written opinion states: "The only evidence tending to such a conclusion aside from the motives that might be imputed to the plaintiff, is the fact that she caused a portion of the furniture to be removed the day before the fire. The court feels that this suspicious action is reasonably explained as above set forth."

We think our brother below failed to attach sufficient importance to the other elements of proof detailed above. We can appreciate his reluctance to decide the issue of arson against an unfortunate woman, and are equally glad that the decision of this case can be put upon the second ground of defense.

The policies provide: "This entire policy, * * * shall be void * * * if the interest of the insured be other than unconditional and sole ownership; or if the subject of insurance be a building on ground not owned by the insured in fee simple."

As her ownership of the houses, the property insured, was unconditional, the question before us is whether or not her ownership of the lots was in fee simple as contemplated in the policies.

 Fee simple is a common-law term and is defined in Bouvier as an estate limited to a man and his heirs absolutely.

"It is the largest possible estate which a man can have, being an absolute estate. It is where lands are given to a man and to his heirs absolutely, without any end or limitation put to the estate."

It is distinguished from a fee-tail which is limited to certain classes of heirs; a determinable fee; a qualified fee, and a conditional fee, which includes one that is either to commence or determine on some condition.

The same work defines reversion as:

"The residue of an estate left in the grantor, to commence in possession after the determination of some particular estate granted out by him. The return of land to the grantor and his heirs after the grant is over. * * *

"In some cases land taken under the right of eminent domain for a specific purpose reverts to the former owner when that purpose has ceased."

We think the term fee simple in the common, corresponds to what in the civil law is called a perfect title.

Article 658 of the Civil Code provides: "The part of an estate upon which a servitude is exercised, does not cease to belong to the owner of the estate; he who has the servitude has no right of ownership in the part, but only the right of using it."

Article 482 of our Civil Code provides:

"Among those which are not susceptible of ownership, there are some which can never become the object of it; as things in common, of which all men have the enjoyment and use.

"There are things, on the contrary, which, though naturally susceptible of ownership, may lose this quality in consequence of their being applied to some public purpose, incompatible with private ownership; but which resume this quality as soon as they cease to be applied to that purpose; such as the high roads, streets and public places."

Under our own law, ownership is divided into perfect and imperfect. Ownership is perfect when it is perpetual and when the thing is unincumbered with any real right towards any other person than the owner. Ownership is imperfect when it is to terminate at a certain time or on a condition; or if the thing, which is the object of it, being an immovable, is charged with any real right towards a third person; as a usufruct or servitude. When an immovable is subject to a usufruct, the owner of it is said to possess the naked ownership. Civ. Code, art. 490.

 Perfect ownership gives the right to use, to enjoy, and to dispose of one's property in the most unlimited manner; this is termed the usus, fructus, and abusus. Civ. Code, art. 491.

These three rights must be united in the same person to constitute perfect ownership. In re Morgan R. R. & S. S. Co., 32 La. Ann. 371.

 From the above it is clear that, at least, after the appropriation of land for levee purposes the owner does not have a perfect title.

 It is true that the taking of riparian land for levee purposes is the exercise of a servitude. Article 665 of the Civil Code provides:

"Servitudes imposed for the public or common utility, relate to the space which is to be left for the public use by the adjacent proprietors on the shores of navigable rivers, and for the making and repairing of levees, roads and other public or common works.

"All that relates to this kind of servitude is determined by laws or particular regulations."

This article is thus construed in the case of Peart v. Meeker, 45 La. Ann. 421, 12 So. 490: "Whatever may be the law elsewhere, we consider the law of Louisiana too well settled to admit of further dispute to the following effect: That under article 665 of our Civil Code riparian property on navigable rivers in this state is subject to a servitude or easement imposed by law for the public or common utility, authorizing the appropriation by the government, under proper laws, of the space required for the making and re-

pairing of levees, roads, and other public works; that the state is charged with the administration of this public servitude; that in locating and building levees she does not expropriate the property of the citizen, but lawfully appropriates it to a use to which it is subject under the title itself; that in so doing she acts, not under the power of eminent domain, but in the exercise of the police power."

Riparian lands are, from their very nature and as an incident of their title, subject to the servitude conferred by article 665. Up to the time that they are actually needed for levee purposes, the existence of this servitude does not limit the use or enjoyment of the land by the owner. But once the servitude is exercised by the erection of levees, the owner is physically evicted. If his property is wholly given over to public use, his present enjoyment of it is completely destroyed. This taking, while not an expropriation within the legal definition of that term, is an appropriation for public use. Only the naked title remains in the owner and the use reverts to him if and when at some time in the future the land is no longer required for levee purposes.

Section 6 of article 16 of the Constitution of 1921, as amended in 1928 provides: "Lands and improvements thereon hereafter actually used or destroyed for levees * * * shall be paid for at a price not to exceed the assessed value for the preceding year." .

Up to the time the property is actually used or destroyed, no compensation is due. After the destruction of the property for private use, its value must be paid up to the amount of the assessment. There is, then, a distinct difference in the situation before and after the appropriation.

In the present case, at the time of the taking out of the policies, the lots involved had been entirely appropriated and paid for to the full assessed value. It is true, plaintiff had not been wholly evicted, but her use of the front portion of the property was only by sufferance, and notice had been given that this slight tenure must cease.

We do not feel called upon to say that the mere existence of a right of servitude is destructive of a fee-simple title. What we are called upon to decide is whether or not a holder of the naked legal title who has been by law evicted from and wholly deprived of the use and enjoyment of the property, whose only interest is conditional and dependent upon the uncertain event of its abandonment for public use, is an owner in fee simple. We consider such a title synonymous with that of reversion under the common-law definition and not one in fee simple.

The provision of the policy is germane and reasonable. Where ownership is not absolute, a situation might arise wherein the moral hazard is materially increased. No better illustration of this could be given than that presented herein: Because of her limited ownership, we find the plaintiff ordered to remove the insured houses from the lots on which they are situated. She has no other property upon which to place them; she has no means to purchase any; she is threatened with the complete loss of property, insured for $1,500 at a time when her cash reserve was reduced to five or six dollars.

Finding the judgment below correct, it is affirmed.