**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 95-30916
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

194.08 ACRES OF LAND, MORE OR LESS, SITUATED
IN ST MARTIN PARISH, STATE OF LOUISIANA,

Defendant,

DANIEL A WILTZ; and JUANITA ELLIS WILTZ,

Defendants-Appellants.

Appeal from the United States District Court
For the Western District of Louisiana

March 9, 1998

Before POLITZ, Chief Judge, and EMILIO M. GARZA and STEWART,
Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Daniel and Juanita Wiltz (the "Wiltzes") appeal the district court's grant of summary judgment in favor of the United States. The district court invalidated the conveyance of a deer hunting servitude from a previous owner to the Wiltzes because the government had already condemned the property that the servitude burdened and held that the government had the authority to condemn the servitude. We affirm.

I

This appeal arises out of the United States' attempts to acquire land for the Atchafalaya Basin Floodway System in Louisiana (the "Project"). Congressional authorization for the Project dates back to 1928, but in 1985 and 1986, Congress greatly expanded the Project's scope by authorizing the acquisition of 23,000 acres for public access and for sporting and recreational activities, including hunting, with the proviso that the land be acquired from "willing sellers." Accordingly, the U.S. Army Corps of Engineers began to contact property owners in areas where it desired to acquire land for the Project to determine if they would be willing to sell their land.

In August 1989, the Wiltzes received a letter from the Corps of Engineers inquiring whether they would be willing to sell part of their property in St. Martin Parish, Louisiana, for use in the Project. This property consisted of tract 167, a 94.08-acre tract, and tract 206, a 100-acre tract. Both tracts were burdened by a deer hunting servitude that Texaco had reserved and recorded when it sold the tracts to a previous owner (the "deer hunting servitude").

The letter from the Corps of Engineers explained that the United States desired to purchase 23,000 acres in fee simple, excluding minerals, from "willing sellers." The letter also stated that if the Wiltzes were willing to sell their tracts of land but were unable to agree with the government on the price to be paid, they could agree to have a court determine a fair price in a

condemnation action. If the Wiltzes were unwilling to sell their property, the letter stated that the government would proceed to condemn easements for flowage, developmental control, and environmental protection.

The Wiltzes consented to sell their property, but they were unable to agree on a price with the United States. Accordingly, the Wiltzes signed two "Agreement[s] to Sell and Set Compensation in Court" for tracts 167 and 206 (the "Agreements"). Each Agreement recited that the Wiltzes owned the tracts and were "willing sellers" of fee simple title, excluding minerals and existing easements for public roads and highways, public utilities, railroads, pipelines, and the Texaco deer hunting servitude.

Pursuant to these Agreements, the United States instituted condemnation proceedings on June 14, 1991, in order to have a court determine a fair price for both tracts. The government deposited estimated just compensation with the court and filed a Declaration of Taking that contained a broad description of the estate taken. The government joined numerous defendants, including the Wiltzes, Texaceaux Hunting Club, Inc., Continental Resources Co., Southern Natural Gas Co., and all unknown owners, heirs, legatees and assigns. Due to a faulty title search on the property, however, the government failed to join Texaco as a defendant, even though Texaco had clearly recorded the deer hunting servitude. As a result, when the government served the named defendants by mail in August 1991, it failed to serve Texaco, although it did publish a *lis pendens* notice in a local newspaper.

The Wiltzes thereafter decided that they did not want to sell their property and attempted to withdraw their acceptance of the Agreements.  Protracted litigation ensued, and ultimately, the Wiltzes and the United States reached a settlement for the government's acquisition of the tracts on March 2, 1994, under which the Wiltzes received all of the estimated just compensation previously deposited with the court and 94.4 percent of the accrued interest.  This settlement, which the district court duly accepted, expressly decreed that no value had been included for the deer hunting servitude.

Still angry that they had not been allowed to withdraw their acceptance of the Agreements, the Wiltzes continued their challenge to the government's taking of their land in a roundabout method: On March 30, 1994, they purchased the deer hunting servitude from Texaco, and on April 28, 1994, they filed another answer to the government's condemnation action.[1]  The Wiltzes alleged that because the government had failed to join Texaco in the condemnation action, the deer hunting servitude had not been extinguished by the Declaration of Taking.  The Wiltzes also claimed that neither they nor Texaco had consented to sell the deer hunting servitude and, accordingly, argued that the government lacked the authority to condemn the servitude.  The district court granted the government's motion to belatedly join Texaco as a

_____

[1]     Texaco subsequently filed an answer stated that it had conveyed the deer hunting servitude to the Wiltzes in March 1994. In the event that the conveyance should be held ineffective, Texaco alternatively asserted that it would be entitled to $50 per acre as compensation for the taking of the servitude.

-4-

defendant and the Wiltzes' motion to substitute themselves as defendants in place of Texaco. The government admitted that the deer hunting servitude existed prior to its institution of the condemnation action and that Texaco possessed it at the time of condemnation. The government also admitted that Texaco was a necessary party to the complete adjudication of the taking and served Texaco with a notice of condemnation in May 1994.

The Wiltzes and the government submitted cross-motions for summary judgment, with the Wiltzes arguing that the United States lacked the authority to condemn the deer hunting servitude and the United States arguing that the servitude had been condemned in 1991 and that Texaco's transfer of the servitude to the Wiltzes was, accordingly, ineffective. The district court referred the summary judgment motions to a special master, who filed a report recommending that the government's motion be granted. The special master found that the servitude was within the scope of the estate that the government condemned in 1991, and that the "willing seller" requirement did not extend to servitude holders. As such, the special master found that Texaco's conveyance of the servitude to the Wiltzes was ineffective because the servitude had been extinguished and reduced to a claim for just compensation when the United States filed the Declaration of Taking. The district court adopted the special master's report and granted the government's motion. The Wiltzes' timely appeal followed.

II

We review the district court's grant of summary judgment in

favor of the government *de novo*. *See Armstrong v. City of Dallas*, 997 F.2d 62, 65 (5th Cir. 1993). Both parties agree that summary judgment is an appropriate method to resolve this case and that there are no genuine issues of material fact. They differ only in whose favor summary judgment should be granted.

A

We first examine whether the scope of the estate that the government condemned, as set forth in the 1991 Declaration of Taking, included the deer hunting servitude.[2] The default rule in eminent domain is that a taking in fee simple establishes a new title and extinguishes all existing possessory and ownership interests not specifically excepted. *See A.W. Duckett & Co. v. United States*, 266 U.S. 149, 151, 45 S. Ct. 38, 38, 69 L.Ed. 216 (1924). Thus, where the government takes fee simple title, it takes all interests, even those it does not specify; where the government takes less than fee simple title, it must expressly indicate what lesser interests are excluded. *See Buckhart v. United States*, 227 F.2d 659, 661 (9th Cir. 1955) (holding that a

---

[2] In Louisiana, the term "fee simple estate" is not used, but is "analogous to full ownership, where the elements of ownership (uses, fructus and absus) are held in common by one person." *Reaux v. Iberia Parish Police Jury*, 454 So.2d 227, 230 n.2 (La. Ct. App. 1984). The Texaco deer hunting servitude is a "limited personal servitude," which is a right that confers a limited use or enjoyment of property that belongs to another, *see* LA. CIV. CODE art. 639 (West 1980), and is roughly analogous to an easement in other states. *See* BLACK'S LAW DICTIONARY (5th ed. 1979) (defining an easement as "a right of use over the property of another"). In Louisiana, "fishing or hunting rights and the taking of certain fruits or products from an estate may likewise be stipulated in the form of a right of use servitude." LA. CIV. CODE art. 640 cmt. (b).

Declaration of Taking "wipes out all interests" in property that are not specifically excluded). When a Declaration of Taking is ambiguous, we construe the scope of the estate taken in a Declaration of Taking in light of the purposes for which the estate is sought to be taken, the language of the entire declaration, and the surrounding circumstances. *See United States v. Pinson,* 331 F.2d 759, 760-61 (5th Cir. 1964).

We first note that the Declaration of Taking stated that the United States was taking fee simple title, less certain excepted interests. Comparison of the narrower language used to describe the estate taken in the Agreements and the broader language used in the Declaration of Taking as well as the prominent mention of the Texaco deer hunting servitude in the Agreements suggests that the government intended the Declaration of Taking to be all-inclusive, save for the specifically excepted interests.[3] Pursuant to FED. R.

---

[3]     Both Agreements state that the Wiltzes are "owners" of tracts 167 and 206 and that they are

> 'willing sellers' of fee title, excluding minerals, as more fully described in the Attached Exhibit 'B,' said land also being subject to existing easements for public roads and highways, public utilities, railroads and pipelines, and subject to the [Texaco Deer Hunting Servitude].

By contrast, the Declaration of Taking described the estate taken as:

> fee simple title to the land, subject however, to existing easements for public roads and highways, public utilities, railroads and pipelines; excepting and excluding from the taking all coal, oil, gas, and all other minerals in and under said land and all appurtenant rights used in connection with the exploration, development, production and removal of said oil, gas and all other minerals, including any existing structures and

-7-

CIV. P. 71A, the government joined all other interest holders (with the exception of Texaco) when it filed the Declaration of Taking, while it neither consulted with nor obtained the consent of these other interest holders with regard to the Agreements, suggesting again that the government intended the Declaration of Taking to include all interests not specifically excepted. Moreover, the government was seeking to acquire land for public access and sporting and recreational use, including hunting. It is difficult to imagine that the government would acquire land for hunting use, *inter alia*, while at the same time preserving Texaco's hunting rights. *Cf. Pinson*, 331 F.2d at 762 ("It would be patently absurd to hold that the government, in taking by eminent domain a flowage easement over land, intended at the same time to preserve a prior flowage easement held by another over the same land."). Finally, when the United States and the Wiltzes settled, the Wiltzes received all of the estimated just compensation but only 94.4 percent of the accrued interest; 5.6 percent of the accrued interest was reserved to compensate Texaco for the deer hunting servitude. If the Declaration of Taking did not include the deer hunting servitude, there would have been no need to reserve this 5.6 percent for Texaco. Accordingly, we find that the estate taken in the Declaration of Taking included the deer hunting servitude.

B

Having determined that the Declaration of Taking encompassed the Texaco deer hunting servitude, the critical issue in this case

---

improvements . . ..

becomes the validity of the Declaration of Taking. If the Declaration of Taking is valid, then title to tracts 167 and 206 passed to the government in July 1991, when it filed the Declaration of Taking. *See* 40 U.S.C. 258a (1997 Supp.) ("Upon the filing said declaration of taking and of the deposit in the court . . . title to the said lands in fee simple absolute, or such less estate or interest therein as is specified in said declaration, shall vest in the United States of America . . . ."). Texaco's subsequent conveyance of the deer hunting servitude in March 1994 would therefore be ineffective, either because the Declaration of Taking extinguished Texaco's servitude and replaced it with a claim for compensation in July 1991 (and Texaco could not sell what it did not own) or because Texaco's conveyance of the servitude violated the Assignment of Claims Act, 31 U.S.C. § 3727 (1983).[4] *See United States v. Dow*, 357 U.S. 17, 20-21, 78 S. Ct. 1039, 1044, 2 L.Ed.2d 1109 (1958) (invalidating a property interest transfer where the government instituted a condemnation action prior to sale

---

[4]     The Assignment of Claims Act provides that

(a) In this section, "assignment" means))

> (1) a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim; or

> (2) the authorization to receive payment for any part of the claim.

(b) An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued.

31 U.S.C. § 3727.

of the interest but filed the Declaration of Taking after its sale because the condemnation action extinguished the prior owner's interest and replaced it with a claim for just compensation); *United States v. Mock*, 476 F.2d 272, 273 (4th Cir. 1973) (holding a property interest transfer to be invalid either because the former owner no longer owned the property or because the transfer violated the Assignment of Claims Act where the interest was transferred after a Declaration of Taking was filed).

Before deciding whether the Declaration of Taking is valid, however, we first address a related point. The government urges us to hold that Texaco's conveyance of the deer hunting servitude violates the Assignment of Claims Act without looking at the merits of this appeal. We reject this suggestion because the government failed to notify or join Texaco as a defendant when it instituted condemnation proceedings and filed the Declaration of Taking in 1991. *See* FED. R. CIV. P. 71A (c)(2) ("[A]ll persons having or claiming an interest in that property whose names can be ascertained by a reasonably diligent search of the records, considering the character and value of the property involved and the interests to be acquired" must be joined). We look to state law to determine what interests are sufficiently important to require joinder under Rule 71A, *see Georgia Power Co. v. Sanders*, 617 F.2d 1112, 1116 (5th Cir. 1980) (en banc), and under Louisiana law, a servitude is an important property interest. *See* LA. CIV. CODE ANN. art 639 & art. 640 cmt. (b) (West 1980). Therefore, Rule 71A mandated that the government join Texaco, and its failure to do so

-10-

means that Texaco and its assigns can challenge the validity of the taking. *See United States v. Catlin*, 324 U.S. 229, 241, 65 S. Ct. 631, 637, 89 L.Ed. 911 (1945); *United States v. Herring*, 750 F.2d 669, 673-74 (8th Cir. 1984) (holding that lack of notice to a party that should have been notified that its property interest was being condemned does not invalidate the taking, but preserves the party's ability to subsequently challenge the statutory validity of the taking and file a claim for compensation); *United States v. 125.2 Acres of Land*, 732 F.2d 239, 243-44 (1st Cir. 1984) (same). The government also argues that publication of a *lis pendens* notice in a local newspaper provided Texaco with sufficient notice of the taking; we reject this argument because publication notice is constitutionally inadequate where the owner could be informed by more effective means. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-16, 70 S. Ct. 652, 657-58, 94 L.Ed. 865 (1950). Accordingly, we consider the validity of the Declaration of Taking.

The Wiltzes challenge the validity of the Declaration of Taking by contending that the United States lacked the authority to condemn property for public access purposes under the Water Resources Development Act of 1986, Pub. L. No. 99-662, § 601, 100 Stat. 4082, 4137, 4142 (1986). The Wiltzes recognize that the sole defense to a condemnation action is a lack of authority. *See United States v. 162.20 Acres of Land*, 639 F.2d 299, 303 (5th Cir. 1981). Citing the principle that a condemnee may challenge "the validity of the taking for departure from the statutory limits," *Catlin*, 324

-11-

U.S. at 240, 65 S Ct. at 637, they contend that the Act authorized the acquisition of land in fee simple from "willing sellers" only, and that the United States was required to obtain the consent of Texaco, which it admittedly failed to get. They further argue that the government lacked the power to condemn the servitude because the authorization to condemn easements for flowage, development control, and environmental protection if property owners were unwilling to sell their property for use in the Project implicitly limited the Corp of Engineers to condemning only these easements and not other property interests.

1

We first address the Wiltzes' argument that the "willing seller" requirement extends to servitude owners and that the government was required to obtain the consent of Texaco. The special master and district court held that this case is governed by *United States v. Certain Parcels of Land in Fairfax County*, 345 U.S. 344, 73 S. Ct. 693, 97 L.Ed. 1061 (1953). In that case, the Belle Haven Realty Corporation, holder of the fee to a sewer system the government sought to utilize, agreed to accept nominal compensation from the government for its sewer properties in exchange for the government's agreement to take the system and to protect Belle Haven householders from future charges for its use. The government then filed a condemnation petition and a Declaration of Taking and took possession of the system. Belle Haven householders, who later alleged that they had been granted easements in the system, were neither consulted nor joined as

-12-

defendants. They subsequently attacked the taking of the system as unauthorized under the Lanham Act of October 14, 1940,[5] ch. 862, 54 Stat. 1125, 42 U.S.C. § 1521, repealed by Act of July 3, 1952, ch. 570, § 1(a)(12), 66 Stat. 3362, because under the 1943 amendment to that Act, the government could acquire existing public works only from "willing sellers," and the government had not obtained their consent. The Court held that the corporation had consented to the taking of the system and the householders were not "owners" whose consent was required prior to the taking. *Id.* at 348-49, 73 S. Ct. at 695-96.

The Supreme Court noted that while the Lanham Act contained a provision permitting the government to acquire "improved or unimproved lands or interests in lands" by condemnation, the 1943 amendment to the Act at issue in *Fairfax County* authorized the acquisition of existing public works only "with the consent of the owners thereof." *Id.* at 348, 73 S. Ct. at 695. The Court explained that the consent requirement in the amendment did not obviate the condemnation provision in the Act because consent can, *inter alia*, "represent an election to have value determined by a court rather than by the parties." *Id.*, 73 S. Ct. at 695. Crucially, in response to the lot owners' argument that the Act required the consent of all of the holders of interests in a piece

---

[5] The Lanham Act of October 14, 1940 provided relief for defense areas with an existing or impending housing shortage by authorizing the condemnation of land for construction sites. 54 Stat. 1125. The 1943 amendment to the Act authorized the acquisition of existing public works where the government obtained the consent of the owners.

-13-

of property, the Court limited the "willing seller" requirement:

> In deciding who are "owners" here, we look to the scheme of the Act itself. We think it unlikely that in providing for the condemnation of public works, Congress at the same time intended to make preliminary negotiations so cumbersome as to virtually nullify the power granted. Yet the interpretation pressed by respondents would have that effect. It would compel the government, before taking public works, to deal with the holder of every servitude to which the property might be subject.

*Id*. at 349, 73 S. Ct. at 696.

Neither the authorization provisions of the Water Resources Development Act nor the facts of this case differ sufficiently from those in *Fairfax County* to provide reason to stray from the Supreme Court's binding precedent. Factually, as contemplated by the instruction that the government acquire land from "willing sellers," the Wiltzes consented to the sale of their land and agreed to have compensation set in a court proceeding. Texaco, the holder of the deer hunting servitude, was neither consulted nor joined as a defendant. The Wiltzes, having obtained the servitude from Texaco, now attack the taking of the servitude as unauthorized under the Water Resources Development Act because the government did not obtain Texaco's consent prior to the taking.

The grant of authority in the 1943 amendments to the Lanham Act is not meaningfully distinguishable from the grant of authority in the Water Resources Development Act which, as explained by the Chief of Engineers's report and the Real Estate Design Memorandum discussed below, permits the acquisition of land from "willing sellers" and contemplates condemnation proceedings between the government and "willing sellers" to resolve "problems." The rule

-14-

of *Fairfax County* also serves the pragmatic purpose of facilitating land acquisition by the government; requiring the government to obtain the consent of every servitude holder, as the dissent suggests, would greatly impede the ability of the government to acquire land because the owner of any servitude could hold out and extract windfall profits for his or her consent, no matter how much the owners of other interests in the property desired to sell their interests. *See Fairfax County*, 345 U.S. at 349, 73 S. Ct. at 696.

The legislative history of the Water Resources Development Act and various Corps of Engineer memorandum, while not clear, also suggest that Congress intended to balance the "willing seller" requirement with practical concerns. The Water Resources Development Act authorized the Atchafalaya Basin Project to be carried out substantially in accordance with a February 28, 1983 report issued by the Chief of the Corps of Engineers. *See* Pub. L. No. 99-662, 100 Stat. 4082, 4137 (1986). The 1983 report described the land subject to potential acquisition as "approximately 50,000 acres of lands identified by the State [of Louisiana] as being available from 'willing sellers.'" Department of the Army, Office of the Chief of Engineers, Atchafalaya Basin Floodway System, LA ¶ 3(a)(4) (Feb. 28, 1983). Various subsequent appropriation acts authorized the disbursement of public monies to purchase property in fee simple for the Project, in accordance with this report. *See* Continuing Appropriations, Fiscal Year 1988, Pub. L. No. 100-202, 101 Stat. 1329, 1329-110 (1987); Supplemental Appropriations, Fiscal Year 1985, Pub. L. No. 99-88, 99 Stat. 293, 313 (1985).

-15-

Other statutes, however, directed the Corps of Engineers to "expedite" the acquisition of fee simple title to property for the Project. *See* Energy and Water Development Appropriations Act, Fiscal Year 1991, Pub. L. No. 101-514, 104 Stat. 2074, 2078 (1990). The Real Estate Design Memorandum issued by the Corps of Engineers in 1988 outlining the acquisition of land for the Project also carefully limited the willing seller requirement to "landowners."[6] Accordingly, we hold that in enacting the Water Resources Development Act, Congress did not intend to require the Corps of Engineers to obtain the consent of servitude holders when it used the term "willing seller."[7]

---

[6]   The Memorandum stated:

In order to identify "willing sellers" we propose to have the property appraised for fee title purchase as well as for acquisition of appropriate easements. We will inform the *landowners* as to the value of fee title for public access and begin preliminary negotiations. . . . If there are problems we will ask *landowners* to sign a statement that they are willing to proceed with condemnation in order to resolve the problem.
        . . . For this project, negotiations are required even if *landowners* are not willing sellers since developmental control and environmental protection easements are required over the land if it is not purchased in fee.

United States Army Corps of Engineers, Flood Control, Mississippi River and Tributaries, Atchafalaya Basin Floodway System, LA: Real Estate Design Memorandum No. 1, at 3 (2d Rev.) (August 1988) (emphasis added).

[7]   The Wiltzes cite several responses by the Corps of Engineers and an assistant attorney general to inquiries by Louisiana Senators Breaux and Johnston for the proposition that the Corps could acquire "fee title only from willing sellers." Even assuming the responses could bind the Corps, however, we find these letters to be ambiguous because they discuss only fee title acquisition and not whether the "willing seller" requirement extends to servitude holders or whether the United States can

-16-

The Wiltzes argue that it would be inequitable not to require the consent of servitude holders because, in some circumstances, the holder of a servitude may have rights greater than those of the fee owner.  The Wiltzes also argue that the "willing seller" requirement should extend to servitude holders because under state law, the Wiltzes did not have the power to affect Texaco's rights as a servitude holder))i.e., the Wiltzes could not sell what they did not own. *See* LA. CIV. CODE art. 620.  This latter argument is echoed by Chief Judge Politz's dissent, which contends that "[t]he critical error in the majority's analysis results from a failure to accord to the servitude at issue that which the Civil Code mandates."  With regard to the Wiltzes' first contention, and Chief Judge Politz's dissent, the present case presents no such circumstances, but it is possible that no servitude might be sufficiently important because in *Fairfax County*, the Supreme Court held that the consent of the lot owners was not required even though they were owners *pro tanto* of the sewer system and their interests in the sewer system comprised "the only real value that it had." 345 U.S. at 350, 73 S. Ct. at 696 (Vinson, C.J., dissenting). With regard to the Wiltzes' second argument and to Chief Judge Politz's dissent, in *Fairfax County*, the Supreme Court specifically held that the willing seller requirement, and the corresponding issue of whose consent is required, are a matter of federal, not state, law.  *Fairfax County*, 345 U.S. at 349, 73 S.

---

condemn servitudes when the landowner consents to the sale. Therefore, we do not accord any weight to these responses.

Ct. at 696 ("In deciding who are 'owners' here, we look to the scheme of the Act itself."). Therefore, the United States was not required to obtain Texaco's consent before condemning the deer hunting servitude.

2

Having decided that the "willing seller" requirement does not extend to servitude owners, we address the Wiltzes' argument that the authorization to condemn easements for flowage, development control, and environmental protection if property owners were unwilling to sell their property implicitly limited the Corps to using its condemnation powers only to acquire these easements and not to condemn other property interests. The Declaration of Taking Act cannot supply any authority to condemn property because it is only a procedural vehicle by which the government may take possession of land that is being condemned. *See United States v. Dow*, 357 U.S. 17, 23, 78 S. Ct. 1039, 1045, 2 L.Ed.2d 1109 (1958).

We find that there is no basis for the claim that the Corps of Engineers lacked the authority to condemn the deer hunting servitude. The federal condemnation statute gives the government the power to condemn any property that Congress has authorized it to acquire. *See* 40 U.S.C. § 257 (1986) ("In every case in which . . . any other officer of the Government has been, or hereafter shall be, authorized to procure real estate for . . . public uses, he may acquire the same for the United State by condemnation, under judicial process, whenever in his opinion it is necessary or advantageous to the Government to do so . . . ."). Under the

auspices of the Water Resources Development Act, Congress directed the Corps of Engineers to "acquire necessary interests in real estate for all features of the project, flood control, development control, environmental protection, and public access." Pub. L. No. 100-202, 101 Stat. 1329-110 (1987). This same act also directed the Corps to "expedite the acquisition, in fee simple, of lands, excluding minerals, for public access in the Atchafalaya Basin Floodway System." *Id; see also* Pub. L. 101-514, 104 Stat. 2074, 2078 (1990). As both the special master and the district court noted, this language clearly authorizes the acquisition of land, and, implicitly under section 257, the condemnation of lesser property interests for the Project. *See South Dakota v. United States Dept. of the Interior*, 69 F.3d 878, 882 (8th Cir. 1995) (holding that a statute that authorized the department to acquire land in trust for Indians impliedly authorized condemnation); *United States v. 125.2 Acres of Land*, 732 F.2d 239, 244 (1st Cir. 1984) (rejecting the argument that the United States lacked the authority to condemn land where the relevant statute gave the government "broad power to acquire, establish, maintain and operate" air navigation facilities); *United States v. 3.38 Acres of Land*, 484 F.2d 1140, 1142 (4th Cir. 1973) (holding that a general appropriations act may provide a sufficient basis for condemnation where Congress intended the act to authorize the acquisition).

Against the broad panoply of these cases widely interpreting the government's condemnation power, the Wiltzes bring no authority to our attention to support their contention that authorization to

-19-

condemn an easement if the property owner does not consent to sell bars the government from condemning lesser property interests. Moreover, concluding that the government could not condemn lesser property interests would undercut our holding that the "willing seller" requirement does not extend to servitude holders because the government would then have no way to acquire lesser interests save for obtaining the consent of their holders. Accordingly, we affirm the district court's holding that the government was authorized to condemn the deer hunting servitude.

C

Our holdings that the Declaration of Taking included the deer hunting servitude, that the United States was not required to obtain the consent of Texaco prior to condemning the servitude, and that the government was authorized to condemn the servitude render Texaco's conveyance of the servitude to the Wiltzes ineffective. As a result, Texaco can submit a claim for compensation for the taking of the deer hunting servitude because the government failed to notify or join it in the condemnation action. *See Dow*, 357 U.S. at 20-21, 78 S. Ct. at 1044. ("The owner at the time the Government takes possession 'rather than the owner at an earlier or later date, is the one who has the claim and is to receive payment.'" (quoting *23 Tracts of Land v. United States*, 177 F.2d 967, 970 (6th Cir. 1949)). The Wiltzes may argue that it would be inequitable to hold the conveyance ineffective because Texaco will receive double payment for the servitude, once from the Wiltzes and once from the government if it files a claim for compensation for the servitude.

The Supreme Court rejected this precise argument in *Dow*, however, noting that there are contractual means by which later purchasers such as the Wiltzes can protect themselves in the event that a conveyance turns out to be ineffective.[8] *See Dow*, 357 U.S. at 27, 78 S. Ct. at 1047.

Accordingly, the district court's grant of summary judgment in favor of the United States is AFFIRMED.

ENDRECORD

---

[8] Chief Judge Politz's dissent contends that because the government did not join Texaco and give it the required Rule 71A notice, the government's taking of the deer hunting servitude is invalid and the government must therefore compensate the Wiltzes for its value. Contrary to this argument and as our opinion discusses above, courts generally hold that the failure to give notice does not invalidate a taking, but preserves the right of the holder to challenge the taking. *See United States v. Herring*, 750 F.2d 669, 673-74 (8th Cir. 1984); *United States v. 125.2 Acres of Land*, 732 F.2d 239, 243-44 (1st Cir. 1984). The government therefore validly took the deer hunting servitude in 1991 and Texaco could not transfer it to the Wiltzes in 1994. As such, the right to compensation belongs to Texaco, not to the Wiltzes.

POLITZ, Chief Judge, dissenting:

The majority opinion fails to apply the Louisiana Civil Code provisions controlling immovable property and I must respectfully dissent.

In my opinion the unique characteristics of Louisiana's civil law involving immovables, the common-law equivalent of real property, are dispositive of the issue before us today and these provisions mandate reversal. Although eminent domain powers are derived from federal law,[9] a proper view of federalism requires that the law of the state where the immovable property is located become the controlling federal rule when a court must determine property interests and the proper disposition thereof.[10]

Under the Louisiana Civil Code, fee simple title and easements do not exist as such. The common-law term "fee simple" corresponds to what in civil law is known as "perfect ownership."[11] "Perfect ownership" gives the unlimited right to use, enjoy, and dispose of one's property, and these rights, termed the "usus," "fructus," and "abusus," must be united in <u>the same person</u> to constitute "perfect ownership."[12] When, as is presented in this case, the property is subject to a limited personal right-of-use servitude, the element of "usus" is restricted and ownership is burdened with a real right in favor of another, leaving the property owner with

---

[9] **United States v. Certain Parcels of Land in Fairfax County**, 345 U.S. 344 (1953).

[10] **Georgia Power Co. v. Sanders**, 617 F.2d 1112 (5th Cir. 1980).

[11] **Wilson v. Aetna Ins. Co.**, 161 So. 650 (La.App. 1935).

[12] **Id.**

only "naked ownership."[13] As naked owners the Wiltzes could not, as the majority holds, sell to the government a property interest they did not own, i.e., the common-law equivalent of fee simple title. That is not legally possible under the controlling civil law provisions.

The critical error in the majority's analysis results from a failure to accord to the servitude at issue that which the Civil Code mandates. Under Louisiana's civil law system, "servitudes are restraints on the free disposal and use of property."[14] A limited personal right-of-use servitude involves an element of the right of ownership -- the "usus" element.[15] Louisiana courts have underscored that a servitude under Louisiana law is not legally identical to an easement under the common law because the servitude owner occupies a significantly superior position. Under the civil law, the owner of the servient estate can do nothing to diminish the use of the servitude or make it more inconvenient.[16] Accordingly, **Fairfax County**,[17] upon which the majority heavily relies, is distinguishable, not

---

[13] La. Civ. Code art. 478.

[14] **Buras Ice Factory, Inc. v. Department of Highways of La.**, 103 So.2d 74, 80 (La. 1957).

[15] 3 A.N. Yiannopoulos, Personal Servitudes §§ 1, 237 (3d ed. 1989).

[16] **Arkansas Louisiana Gas Co. v. Cutrer**, 30 So.2d 864 (La.App. 1947); **Louisiana Power & Light Co. v. Bennett**, 107 So.2d 468 (La.App. 1958); La. Civ. Code art. 748; see also La. Civ. Code art. 645.

[17] 345 U.S. 344.

dispositive[18] and, most importantly, cannot be applied in a civil law setting with its unique property ownership structure. In light of the unyielding legal provision that a limited personal right-of-use servitude includes an element of the right of ownership under civil law, when land that is burdened with a servitude is taken by eminent domain, if the government is to obtain the common-law equivalent of fee simple title the government <u>must</u> take <u>both</u> ownership and servitude, making the person entitled to the servitude a necessary party to the proceedings. The government in this instance not only failed to obtain the servitude holder's consent, but it failed to make the servitude holder a party to the underlying proceedings by giving the requisite Rule 71A notice.

The government did not obtain the common-law equivalent of fee simple title. It could not do so from the Wiltzes alone; it did not do so by adding Texaco, assuming it had the power to do so.[19] The Texaco deer-hunting servitude, a real interest in the property, has not legally been acquired by the government. It belongs to the Wiltzes. They should be compensated for its fair value if they are deprived of its ownership as the majority has affirmed. I must dissent. I would

---

[18] The Lanham Act of October 1940 controlled in **Fairfax County**. The condemnation authority granted by Congress in that Act, as amended in 1941 authorizing condemnation of public works, including sewers, is significantly legally different from the power granted in the instant case.

[19] Under the Water Resources Development Act of 1986, Pub.L. No. 99-662, § 601, 100 Stat. 4082, 4137, 4142 (1986), the government's power herein was limited to securing full ownership from willing sellers. Its powers of expropriation were limited to acquiring easements over private land for flood control and environmental protection. It was not given authority to expropriate property for recreational development and public access. Nonetheless, that effectively has been done herein.

vacate the summary judgment entered by the district court and remand for entry of summary judgment in favor of the Wiltzes.